PALLIS CARPENTER

*v.*

JAMES S. CARPENTER.

1. TRUST — *redemption of land with one's own money.* Where the owner of land borrowed money, and gave an absolute conveyance of the same as a security for its re-payment, with interest, and afterwards, getting into a difficulty, left the country for parts unknown, and, on his way, wrote to his father and brother-in-law to redeem the land and it should be theirs, and the father did redeem the same on the faith of such letter, paying all the land was then worth, taking a deed to himself, and improved the same, and finally sold it, investing the proceeds in other land: *Held,* that the father was not a trustee for the son, and, as such, liable to account for the rents and profits, especially after a lapse of eighteen years unexplained.

2. MORTGAGE—*election to treat the conveyance as absolute.* If a party makes an absolute conveyance of land as a security for the payment of money, he may abandon the payment of the debt, and cancel the secret agreement, and treat his conveyance as absolute, instead of a mortgage, and he will be bound by such election.

3. LACHES—*as affecting relief in equity.* A court of equity will refuse its aid to stale demands, where the party has slept upon his rights, or acquiesced for a great length of time. Nothing can call forth the aid of the court but activity, good faith and reasonable diligence. Where these are wanting, the court is passive, and does nothing. *Laches* and neglect are always discountenanced.

APPEAL from the Circuit Court of Grundy county; the Hon. JOSIAH McROBERTS, Judge, presiding.

Messrs. PILLSBURY & LAWRENCE, and Mr. D. L. MURDOCK, for the appellant.

Mr. E. SANFORD, for the appellee.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill in chancery, filed by James S. Carpenter against Elisha Carpenter, Pallis Carpenter and John L. Meier, in the circuit court of Grundy county, on the 2d day of November, 1870.

The bill states that, in May, 1849, complainant entered a certain tract of land, in Grundy county, containing 240 acres, and received a patent therefor; that, on the 1st of March, 1852, complainant borrowed, of one Orson Felt, $250, and agreed to pay interest on the same at the rate of 25 per cent per annum, and, to secure the payment of the loan, he executed and delivered a deed of the land to Felt; that, after obtaining the loan, complainant removed to California, and left Elisha Carpenter, his father, in charge of the property; that, in January, 1853, while complainant was in California, Elisha Carpenter, and Gideon Lumbeck, who was a brother-in-law of complainant, paid the amount due Felt, $312.50, and Elisha Carpenter, to cheat and defraud complainant, induced Felt to make and deliver Carpenter a warranty deed for the land; that Carpenter received rents and profits of the land to the amount of $5000, and, to cheat and defraud complainant, conveyed 160 acres of the land to John L. Meier, for $5000; that Meier knew Carpenter had no title to the land; that Elisha Carpenter, to further cheat the complainant, took the money for which he sold the land, and purchased 160 acres of land in McLean county, which is now occupied by Elisha and Pallis Carpenter.

Complainant charges that the McLean county land belongs to him, and prays for an account, etc.

The answer of John L. Meier admits that he bought the 160-acre tract in Grundy county, but that he bought and paid for the same in good faith, believing that Elisha Carpenter was the owner thereof.

The defendants, Elisha and Pallis Carpenter, answer the bill, and admit that $312.50 was paid by Elisha Carpenter to Felt, and that he obtained a deed, but not for the purpose of cheating complainant; admit the use of the land until the sale to Meier, but that the rents did not pay for money and labor expended in improvements; allege sale to Meier in good faith; admit they reside on the land in McLean county, as their own; deny that it was bought with complainant's money;

deny that complainant has any right to the land, or rents and profits, and allege that, soon after complainant conveyed to Felt, he left for parts unknown, in consequence of a difficulty with a girl in the neighborhood, and went to California, and on the road, he wrote to Elisha Carpenter to go to Felt and pay off the debt, and he should have the land as his own; that, upon receiving the letter, he went to Felt, paid the debt ($312.50), purchased the land and took a deed therefor; that, at this time, the land was wild and unimproved prairie, worth not to exceed $1.25 per acre; that, in 1857, he conveyed 80 acres of the land to his daughter, Artimesia Lumbeck; that the defendant acted in good faith on the proposition in the letter, and believed that, if he bought the premises, the complainant would never disaffirm the offer contained in the letter; that, after defendant acted in good faith in advancing his money to buy the land, and in improving and making the same valuable, relying on the offer of complainant in his letter, it is unjust and inequitable, after so long a time, for complainant to claim an interest therein, and, in equity, he is estopped; that, if complainant ever had any right to relief, he has forfeited the same by his own *laches;* that, even if the deed from complainant to Felt was for a loan, in the nature of a mortgage, the deed from Felt to defendant was a warranty deed, and was the closing up of the transaction between complainant and Felt, and defendant, Carpenter, received the deed in good faith, and that he and his grantee have had possession and paid all taxes for seven successive years, and complainant is barred by the Statute of Limitations.

The evidence in this case is somewhat voluminous, and, upon some questions, contradictory. The facts, however, upon which the decision of the case must rest, are, in the main, clearly proven, and not very contradictory.

In 1849, the complainant entered 240 acres of land in Grundy county. On the 1st of March, 1852, he borrowed, of one Orson Felt, $250, for one year, and agreed to pay 25

per cent interest thereon, and, to secure the payment of the money, he conveyed to Felt the 240 acres of land by general warranty deed of conveyance. In August, 1852, the complainant, having been unsuccessful in a love matter with a girl in the neighborhood, started for California, and, when he reached Chicago, on the road, he wrote a letter to Elisha Carpenter, and his brother-in-law, Gideon Lumbeck, the contents of which is very material, and disputed by the parties. Elisha Carpenter testifies that complainant wrote to them he had started for California, and for them to pay the demand that was against the land, and take it, and it is yours; that he would never return from California until he was able to set his heel upon the neck of the Gnil tribe (these were the relatives of the girl with whom he had not been successful). Gideon Lumbeck, who, by his testimony, does not seem to be in sympathy with the defense, on cross-examination, says, complainant wrote them, from Chicago, "Redeem the land, and it shall be yours." These are the only witnesses, that saw the letter, who swear to its contents. It is true, complainant seeks to place a different construction on the meaning of the letter, but the weight of evidence clearly is, that complainant directed or requested the defendant, Carpenter, and Lumbeck, to discharge the land of the debt, and they should have it.

After receiving this letter, Elisha Carpenter entered upon the task to raise money to pay Felt. He sold 40 acres of land, with a house upon it, for $190, oxen for $50, corn for $17.50; Lumbeck and he cut and sold hay, and raised a part of the money, and, in the spring of 1853, Carpenter went to Felt, gave him this letter he had received, and paid the debt, then amounting to $312.50, and Felt conveyed the land to him. He subsequently conveyed 80 acres of the land to Lumbeck, or his wife. The other 160 acres he improved, and resided upon it until 1865, when he sold it to Meier, and bought a farm of 160 acres in McLean county, where he resided when the suit was commenced. As to the value of the land in the

spring of 1853, the evidence does not agree. The defendant, Carpenter, and Meier, testify the land was not worth more than $1.25 per acre; that there was plenty of land, subject to entry, all around it. On the other hand, Lumbeck swears it was worth from $5 to $8 per acre. It is, however, very evident the land, at that time, was not valuable. Complainant had made no improvements upon it. It was wild, unimproved prairie, surrounded with government land subject to entry at $1.25 per acre.

Complainant left Grundy county in August, 1852; left no person in charge of his land, and no arrangement by which the debt upon it was to be discharged, and did not return until 1870. From 1856, he was not heard from by his relatives in Illinois. He paid no taxes on the land after his departure, and never returned the $312.50 which Elisha Carpenter paid Felt in the spring of 1853.

It is claimed by the counsel for complainant, that this land was held, by Elisha Carpenter, in trust for complainant, and that he had the right to recover the land, and call upon him, as trustee, for an account.

In order to determine if the relation of trustee and *cestui que trust* existed between these parties, it becomes necessary to recur to some of the leading principles of law governing that relation.

There can be no doubt but the deed held by Felt, although absolute on its face, was, in fact, a mortgage, and it is clear, from the evidence, that Elisha Carpenter, in taking a deed from Felt, and his subsequent dealing with the property, has acted in perfect good faith; no fraud, in fact, is shown, in any respect, against him, and, if his acts are to be considered fraudulent, it is fraud in law, and not in fact. It is argued by appellee, that he supposed the deed from Felt was taken in his name, and not in that of his father. He had no right, from all the facts, to come to that conclusion. He knew that he had made Felt an absolute deed, and that Felt could convey the land. He started to leave the State without making

any arrangements to pay the debt he had placed on the land. He, no doubt, had given up any hope of paying the debt. On his road to California, he wrote to Elisha Carpenter and Lumbeck, to redeem the land and it should be theirs. How did he suppose they would get the title? The answer to this is obvious. He knew Felt could convey, and knew full well if they presented Felt the letter, and the money due him, he would be authorized to deed to them. Knowing all these facts, he could not, with any consistency, expect or believe that they would advance their own money, and pay all, or nearly all, the land was worth, and take the title in his name.

This case, in many respects, is analogous to that of *Botsford* v. *Burr*, 2 Johns. Ch. Rep. 405. Botsford applied to Burr for a loan of $900, to enable him to pay a mortgage on the Bogardus farm. Burr refused to loan the money, but agreed to buy in the farm, when sold on mortgage, and to reconvey the same to Botsford, if he paid him the money advanced, within a month. Burr, accordingly, bought in the farm, and subsequently sold the same at an advance. A bill was filed to make him account and pay over the balance, after deducting his advances. The court held, that, as Burr purchased at public auction, took deed in his own name, and paid his own money, and, as the sale was made with the knowledge and assent of Botsford, there was no pretense for setting up a resulting trust. It was further held, that the conveyance by Bogardus, the mortgagee, and the payment of purchase money, completed the contract, and that no parol proof of parol declarations inconsistent with the deed, could be admitted.

In this case, the defendant did not even agree to loan the complainant money, but at the request of complainant, he went and advanced his own money, and paid for the land, and took a deed in his own name.

While it is true, Felt held as mortgagee, the complainant had the right to abandon the payment of the debt, and cancel the secret agreement between him and Felt, and treat the

conveyance to Felt as an absolute deed, instead of a mortgage, and request him to convey, and if, in fact, he did elect and agree to treat the deed to Felt as absolute, he will be bound by such agreement. *Maxfield et al.* v. *Patchen,* 29 Ill. 42.

But, independent of this question, the defendants, by their answer, rely on the defense of *laches.*

The complainant, during a period of eighteen years, paid no attention to this land; made no arrangement with any one to pay taxes for him. Under the laws of the State, it could have been sold for taxes, deed obtained, taxes paid under the deed, which, with possession, at the expiration of nine years after his departure, would have ripened into an absolute bar to a recovery, as against him.

In 1853 or 1854, Elisha Carpenter took possession and commenced to improve the land. The absolute deed of complainant to Felt, and from Felt to defendant, were on the records of Grundy county from the spring of 1853. This was a public record, showing the defendant to be the owner. There was the further fact, of defendant being in possession, making valuable improvements, paying taxes, and in every way treating the land as his own. As early as 1856, he sells 26 acres, and, in 1865, the balance of the quarter. We are aware of no principle of equity that would permit complainant to abandon this property for eighteen years, when the records of the county, and the notorious acts of the defendant, would have shown him at any time that the defendant was claiming to be the owner, and more especially as he knew, when he left, that Felt would sell the land for the debt, if he did not pay it, until it has become valuable by the labor of the defendant, and then recover it from him, when he was induced to advance his own money and save the land, on the faith of complainant's promise that it should be his.

Perry on Trusts, sec. 870, says: "Acquiescence in a transaction may bar a party of his relief, in a very short period. Thus, if one has knowledge of an act, or if it is done with his full approbation, he can not afterwards have relief. He

is estopped by his acquiescence, and can not undo that which has been done. So, if a party stands by and sees another dealing with property in a manner inconsistent with his rights, and makes no objection, he can not afterwards have relief. His silence permits or encourages others to part with their money or property, and he can not complain that his interests are affected. His silence is acquiescence, and it estops him."

Sir WILLIAM GRANT, in the case of *Beckford et al.* v. *Wade,* 17 Ves. 87, says: " Courts of equity, by their own rules, independently of any statutes of limitations, give great effect to length of time, and they refer frequently to statutes of limitations for no other purpose than as furnishing a convenient measure for the length of time that ought to operate as a bar, in equity, of any particular demand."

In *Smith* v. *Clay,* 3 Brown's Ch. Rep. 640, it is said: "A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, or acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive, and does nothing. *Laches* and neglect are always discountenanced, and, therefore, from the beginning of this jurisdiction, there was always a limitation of suit in this court."

It is said, in Vol. 2 of Story's Equity Jurisprudence, section 1520, in discussing this question: "A defense peculiar to courts of equity, is that founded upon the mere lapse of time, and the staleness of the claim in cases where no statute of limitations directly governs the case. In such cases, courts of equity act sometimes by analogy to the law, and sometimes act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere where there has been gross *laches* in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights."

The same doctrine is announced and fully sustained by the Supreme Court of the United States in the following cases: *Pratt* v. *Vallier,* 9 Peters, 416; *Prevert* v. *Graty,* 6 Wheat. 481; *Bowman et al.* v. *Nathan,* 1 Howard, 194.

This court has frequently announced the same principle in regard to *laches,* and the enforcement of stale claims in a court of equity. *Beach* v. *Shaw,* 57 Ill. 25; *Rogers* v. *Simmons et al.* 55 Ill. 82.

Testing the case under consideration by the authorities cited *supra,* we can arrive at no other conclusion than that the complainant was not entitled to recover. Seven years' possession, and payment of taxes under a deed acquired in good faith, is a bar to a recovery at law.

That the defendant, Elisha Carpenter, paid his own money and took the deed in good faith, is shown by the record. That he was in possession, and paid all taxes, claiming the land as his own, for a sufficient length of time to bar a recovery at law, is beyond dispute.

We are asked, in this case, not only to disregard the limitation at law, which a court of equity should, with reason and propriety, follow, but to hold that complainant may sleep upon his rights for eighteen years, and then recover, and thus reap the benefit of the labor of another, as a reward for his *laches.* This we can not do.

The decree will be reversed and the bill dismissed.

*Decree reversed.*