WILLIAM E. BENSON *et al.*

*v.*

CLANCEY J. DEMPSTER *et al.*

*Opinion filed December 18, 1899.*

1. TRUSTS—*express trust must be manifested in writing.* An agreement by the grantee in a deed absolute in form, to hold and manage the property until the encumbrance thereon should be paid and a sufficient amount be raised to pay the grantor's indebtedness to the grantee, when the property should be re-conveyed, is an express trust, and is void under the Statute of Frauds unless manifested in writing.

2. LACHES—*when laches of alleged cestui que trust will bar relief.* A delay of thirty-eight years by a grantor in an absolute deed in asserting an express trust, under which the grantee was to re-convey the property, will bar relief in equity, where, during that time, he permitted the heirs of the grantee, who died shortly after the conveyance, to believe they were absolute owners of the property, without asserting the trust until the property, of doubtful worth at the time of the conveyance, had become valuable.

3. SAME—*what will not excuse laches in asserting trust.* Belief and confidence in the integrity of the grantee will not excuse delay by the grantor in enforcing an alleged parol agreement to re-convey, where, for over thirty years after the grantee's death, the grantor, though having knowledge of that fact, permitted the grantee's heirs to deal with the property as their own without notifying them of the trust.

APPEAL from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

This was a bill in chancery brought by William E. Benson and Frank A. Benson, the sons and only heirs-at-law of Francis H. Benson, deceased, against Clancey J. Dempster and others, the only heirs-at-law of John Dempster, deceased, and Killian V. R. Lansingh, as administrator *de bonis non* of the estate of said John Dempster, and also as executor of and trustee under the will of Orrea W. Dempster Lansingh, a deceased heir of said John Dempster, deceased, and also as the husband of said Orrea W. D. Lansingh, personally, to establish and

enforce a trust alleged to have been created in the year 1859 between said Francis H. Benson and said John Dempster, and for an accounting in respect to said trust property. The original bill was filed April 25, 1899, and, a demurrer thereto having been sustained, an amended bill was filed June 14, 1899. All of the defendants filed a joint demurrer to the amended bill, and upon the hearing of said demurrer the same was sustained, and, the complainants electing to stand by their amended bill, the bill was dismissed for want of equity at complainants' costs. The complainants bring the record to this court by appeal.

The amended bill alleges, in substance, that in 1857 Francis H. Benson, the father of complainants, was in the banking business in Chicago; that John Dempster was a depositor in Benson's bank, and on October 8, 1857, had on deposit therein $10,222.01; that on October 8, 1857, said Benson made an assignment of his property for the benefit of his creditors to John L. Beveridge and William P. Moss, Jr., at which time Benson owed said Dempster only said sum of $10,222.01; that thereafter an agreement was entered into between the said Benson, his creditors and assignees, that he should assist his assignees in the settlement of his debts and business affairs, and that in pursuance of said agreement and in compliance with the urgent requests of said Dempster, said Benson, with the consent of his said creditors and assignees, transferred, or caused to be transferred, to said Dempster, during or about the years 1859 and 1860, the legal title to certain personal property and a large amount of real estate in said Cook county and elsewhere, (particularly describing the same,) which then constituted a part of the estate of said Benson, all under and in pursuance of a certain agreement by and between said Benson and said Dempster that said Dempster should manage, use and dispose of said property as his own, and endeavor, by so doing, to realize therefrom, if possible, a sufficient amount to

pay all encumbrances upon the same, and, in addition
thereto, to pay himself the amount of the indebtedness
of said Benson to him, together with interest thereon,
and all of his other expenditures in connection with the
management and disposition of said property, it being
further agreed that said Dempster should use his own
judgment and discretion in the use and disposition of
said property, and should there be any excess of said
property, or of the proceeds thereof, over and above the
amount necessary to make the payments above mentioned,
then that such excess, if any, should thereupon be ac-
counted for by said Dempster to said Benson, and that
the legal title and possession thereof be transferred by
said Dempster to said Benson as said Benson's own prop-
erty, all of said agreement being made with the consent
of the said Benson's creditors and assignees; that all
of said property so transferred by said Benson to said
Dempster was then heavily encumbered and of very
doubtful and uncertain value, and that it was then very
questionable, and, in fact, improbable, that enough could
be realized therefrom to make the payments above men-
tioned; that the transfer of said property by said Benson
to said Dempster was by deed absolute in form, but it is
alleged it was not an absolute sale thereof to said Demp-
ster, but was made to enable said Dempster, by handling
and disposing thereof, to pay the encumbrances himself,
the said indebtedness of $10,222.01, and interest thereon,
and expenses of carrying and disposing of said property,
and that his duty was then to account for and turn over
the balance thereof, if any, to said Benson and his heirs;
that said Dempster proceeded to handle and dispose of
said property under said agreement, but never made any
report or rendered any account in respect thereto to said
Benson, nor did said Dempster, nor have his heirs, or
any one for them, turned over, or offered to turn over,
to said Benson or his heirs any of said property or the
proceeds thereof; that said Dempster died intestate in

Cook county on November 29, 1863, and that defendants, with the exception of Lansingh, are his only heirs-at-law, and that Lansingh was from 1880 until July 6, 1897, the administrator *de bonis non* of the estate of Dempster, and that he was on the last mentioned date discharged as such administrator, but the fact of such discharge was never known to said Francis H. Benson; that complainants do not know, and cannot ascertain until there has been a full accounting between the parties hereto, at just what time there was realized by said 'John Dempster, his heirs and legal representatives, from the property so transferred by said Francis H. Benson to said John Dempster, a sufficient amount to provide for said encumbrances thereon, and to pay said indebtedness of said Francis H. Benson to said John Dempster, with interest thereon, and the expenses attending the carrying and disposing of said property, but that, on information and belief, the amount realized by said John Dempster from said property was, up to the time of his death, not sufficient to provide for said encumbrances and pay said indebtedness; that at the death of said John Dempster, on November 29, 1863, there remained in his hands a large portion of said property so transferred to him by said Francis H. Benson, or the proceeds, profits and increase thereof, and other property for which he had traded or exchanged parts of said property so transferred to him, and all of which property which so remained in the hands of said John Dempster his heirs have taken and used, and received the proceeds, profits, income and increase thereof as their own property, claiming to inherit the same by descent from said John Dempster, all of which was, however, unknown to the said Francis H. Benson until he recently learned thereof, as hereinafter set forth; alleges, upon information and belief, that the proceeds and receipts from said property by said John Dempster and his heirs were many years ago (but at what time the complainants are unable to determine until an account-

ing is had) sufficient to, and did, discharge the encum-
brances on said property and pay the said indebtedness
of said Benson to said Dempster, and afterwards there
remained in the hands of the heirs of said Dempster much
of the said property and proceeds and increase and in-
come which they held in trust for said Francis H. Ben-
son and his heirs, which they should account for and turn
over to the complainants; that for a number of years
prior to the transfer of said property by said Francis H.
Benson to said John Dempster, said Benson had been in-
timately acquainted with said Dempster, and had great
faith and confidence in him and his integrity, and trusted
implicitly that said Dempster would promptly and prop-
erly report and account for and turn over to him the
balance, if any, of said property, or the proceeds thereof,
remaining in his hands after the payment of said Ben-
son's indebtedness to said Dempster, but that said Ben-
son never received any report from said Dempster in
respect thereto; that at the time of the transfer of said
property by said Benson to said Dempster, and from
thence until said Benson's removal from the city of Chi-
cago, in 1865, as hereinafter stated, there was little or
no market or demand for property of the class, kind and
location of the property in question; that said Benson
knew that said Dempster had disposed of a part of said
property during his (said Dempster's) lifetime, and sup-
posed and believed, until he learned to the contrary, as
hereinafter stated, that all of said property had been
disposed of by said Dempster, his heirs and representa-
tives, before its value had materially increased over what
it was at the time it was transferred to said Dempster,
as aforesaid, and that there had been realized therefrom
an insufficient amount to discharge the encumbrances
thereon and to pay the aforesaid indebtedness of said
Benson to said Dempster, and that there remained no
surplus to account for to said Benson, but, on the con-
trary, a deficit, leaving him still in debt to said Dempster

or his heirs or legal representatives; that subsequently to the transfer of said property from Benson to Dempster, and during 1865, said Benson removed from Chicago to Bothwell, Canada, and lived there until 1869, when he removed to Kansas City, Missouri, and resided there until some time in 1895, when he returned to Chicago and resided there until his death, in 1898; that from the time Benson made his assignment, October 8, 1857, until his death, he was in straitened circumstances, and believed, until he learned to the contrary, that he was still indebted to said Dempster instead of the estate being indebted to him; that said Benson did not, until long after his return to Chicago, and but a short time prior to his death, which took place on November 25, 1898, know or even suspect, or have cause to suspect, that said property which had been transferred by him to said Dempster had yielded to said Dempster, or his heirs and legal representatives, any increase or surplus over and above the amount sufficient to make the payments aforesaid; that shortly before the time of his' death said Benson learned that part of the said property which had been transferred by him to said Dempster was still held by the heirs and legal representatives of said Dempster and was considered valuable property; that he thereupon immediately commenced and diligently proceeded to investigate the matter, and thereafter, and as a result thereof, learned for the first time that any portion of said property, proceeds, income or profits thereof or increase thereto remained with the heirs or administrator of said Dempster after the payment of the said indebtedness, or that any portion of the said property had remained with said Dempster and his heirs and administrators long enough to be affected by the rise in values of property in and about Chicago that occurred after the removal of said Benson from Chicago; that as soon as said Benson learned, as aforesaid, that said property conveyed by him to said Dempster had yielded a sufficient amount to said Dempster and his heirs and rep-

resentatives to pay his aforesaid indebtedness to said Dempster, together with interest and expenses, and that the said indebtedness had been thereby paid, and that there did remain, after the payment thereof, with the heirs and legal representatives of said Dempster a surplus of said property, together with proceeds, profits and income therefrom and increase thereto, and on or about the month of July, 1898, said Benson caused a demand to be made for an accounting thereof and in respect thereto upon the said administrator *de bonis non* of the estate of the said Dempster, but which demand has never been complied with and no accounting in respect thereto ever made, nor has said property, surplus, profits, income or increase, or any part thereof, at any time, ever been surrendered or turned over or accounted for to said Benson or the complainants, by the heirs or legal representatives of said Dempster.

The bill prays that an account may be taken of the dealings of said John Dempster, and that the proceeds, profits and income derived therefrom, from the time they had realized a sufficient amount therefrom to pay said indebtedness of said Benson to said Dempster, be declared to be held by the heirs of said Dempster only in trust for said Benson, complainants offering to allow what, on accounting, was found to be due said defendants, and for such other and further relief as equity may require.

JOHN WOODBRIDGE, ALFRED E. HOLT, and EWING, WINCHESTER & CRAIG, for appellants.

WILLIAM S. FREEMAN, and EDWIN BURRITT SMITH, for appellees.

Mr. JUSTICE CRAIG delivered the opinion of the court:

A careful reading of the original and amended bills will disclose that in neither was it alleged, nor is it claimed, that there was or is now any writing indicating that John Dempster held this property in trust. The

words, "in pursuance of a certain agreement by and between said Benson and Dempster," are the words used. The deed transferring the property from Benson to Dempster was absolute in form and contained no words indicating a declaration of trust or defeasance, but the transfer was made in payment of a debt of $10,222.01. If any relation of trust can be imputed to John Dempster it arose out of a verbal understanding, and comes within the Statute of Frauds and Perjuries. Section 9 of chapter 59 of the Revised Statutes of Illinois provides: "All declarations or creations of trusts or confidences of any lands, tenements or hereditaments, shall be manifested and proved by some writing signed by the party who is by law enabled to declare such trust, or by his last will in writing; or else they shall be utterly void and of no effect: *Provided,* that resulting trust or trusts created by construction, implication or operation of law, need not be in writing, and the same may be proved by parol." The deed or conveyance alleged to have been made was from Francis H. Benson, as grantor, to John Dempster, as grantee, and any rights which he reserved were in the nature of an express trust. Where there is an express trust there cannot be a resulting trust. A voluntary conveyance cannot be held to create a resulting trust for the grantor. (*Stevenson* v. *Crapnell*, 114 Ill. 19.) In *Biggins* v. *Biggins*, 133 Ill. 211, it was said, referring to the case of *Stevenson* v. *Crapnell, supra:* "It is there held that an express trust between the grantor and grantee of land that the grantee is to hold the land in trust for the grantor or is to re-convey to him on a certain contingency is invalid, under the Statute of Frauds, unless evidenced by some writing signed by the grantor." What was said in *Rogers* v. *Simmons*, 55 Ill. 76, can very properly be applied to the case under consideration: "The deed in this case is absolute. The alleged declaration or creation of trust is not manifested or proved by any writing, and is therefore, as an express trust, utterly void and of no effect."

The alleged trust between Benson and Dempster, being an express trust, is within the statute, and cannot be proved by parol evidence, and is void and of no effect.

Another serious objection apparent on the face of the bill is the gross *laches* of Francis H. Benson, the father of the complainants. The amended bill alleges that the transfer from Benson to Dempster was made in 1859 and 1860; that Dempster died on November 29, 1863; that letters of administration issued to Orrea W. D. Lansingh May 27, 1864, and that ever since the death of said John Dempster the property so transferred to him "his heirs have taken and used, and received the proceeds, profits, income and increase thereof as their own property, claiming to inherit the same by descent from said John Dempster." It is also alleged that Francis H. Benson lived in Chicago until 1865; that he lived there when Dempster's death occurred and at the probating of Dempster's estate; that the defendants, the heirs of Dempster, claimed to own the property transferred by Benson to Dempster. There is no allegation that he (Benson) did anything during this time, or notified the heirs in any way, or did anything to put the heirs upon notice, that any trust relation existed as to said property, and there is no allegation that any of Dempster's heirs, or any agent representing them, ever knew that Benson claimed any interest in said property. He filed no claim against the estate of Dempster, and did nothing by which the heirs could know that a secret trust existed. Besides, the bill alleges "that the amount realized by said John Dempster from said property was, up to the time of his death, not sufficient to provide for said encumbrances and pay said indebtedness, * * * and that there remained no surplus to account for to said Benson, but, on the contrary, a deficit, leaving him (Benson) still in debt to said John Dempster, or his heirs or legal representatives," in 1865. Benson thus knew at this time, as the bill alleges, *that a deficiency existed.* He said nothing to the heirs, but kept

still, leaving the heirs to believe that Dempster had taken the property absolutely in payment and discharge of the debt due from Benson to Dempster when the transfer was made. Benson, in effect, *abandoned* the alleged trust at that time. He remained silent about thirty-eight years, (his death having occurred November 25, 1898,) until about the month of July, 1898, when the amended bill alleges he caused a demand to be made on the administrator *de bonis non* for an accounting. The property, when transferred, was, as the bill alleges, "then heavily encumbered and was of very doubtful and uncertain value, and it was then questionable, and, in fact, improbable, that sufficient amount could be realized from said property to make the payments above mentioned." This property, it thus appears, was of little value, and now that it has become valuable complainants claim that Dempster received it charged with a trust as to the surplus over and above the indebtedness, encumbrances, etc., notwithstanding that their father had, in effect, abandoned it in 1864. This they cannot do after so great delay.

In *Williams* v. *Rhodes*, 81 Ill. 571, it was said (p. 588): "A delay which might have been of no consequence in an ordinary case may be amply sufficient to bar the title of relief where the property is of a speculative character or is subject to contingencies, or where the rights or liabilities of others have, in the meantime, been varied. If the property is of a speculative or precarious nature it is the duty of the party complaining of the fraud to put forward his complaint at the earliest possible time. He cannot be allowed to remain passive, prepared to affirm the transaction if the concern should prosper, or to repudiate it if that should prove to his advantage."

These allegations show there was inexcusable delay on the part of complainants' ancestor, and his heirs, the complainants, now that the property has become valuable, cannot claim the benefit of an alleged trust. It was also said in *Mayfield* v. *Forsyth*, 164 Ill. 32: "Here was a

period of almost thirty-one years in which the complainants, with a full knowledge of all the facts in relation to the manner in which Robert N. acquired the land, have remained silent and made no effort whatever to set up any claim or assert any rights to the land. The delay is inexcusable, and this court has held in numerous cases that a delay for a much shorter period will bar a recovery.—*Beach* v. *Shaw*, 57 Ill. 17; *Owen* v. *Peacock*, 38 id. 33; *Carpenter* v. *Carpenter*, 70 id. 457; *Brown* v. *Brown*, 154 id. 35; *Quayle* v. *Guild*, 91 id. 378; *McDearmon* v. *Burnham*, 158 id. 55." Benson knew how Dempster had acquired the land, and yet during this long period he made no effort to set up any claim that it was held in trust by Dempster. No sufficient excuse is given in the bill to overcome the presumption of acquiescence by Benson during this period of thirty-eight years. Benson resided in Chicago at the time Dempster died, when his estate was administered upon, and until 1865. He was absent then in Canada, and removed to Kansas City, Missouri, in 1869, returning to Chicago in 1895, and continued to reside there until his death, in November, 1898. Why was no effort made after Benson's return, from 1895 to 1898, to recover the property? He knew, or could have known by the exercise of ordinary diligence, that the heirs of John Dempster claimed absolute title to the property transferred by him, and claimed to inherit it by descent from their father, John Dempster. The inventory and papers in the probating of Dempster's estate would have shown it, and it is alleged in the bill that ever since Dempster's death the property so transferred by Benson "his heirs have taken and used, and received the proceeds, profits, income and increase thereof as their own property." He could have found from the public records that Dempster's heirs had paid and were paying the taxes. Even after Benson's return from Missouri, in 1895, he made no demand on the administrator until 1898. Dempster he knew was dead, and he knew of his rights under the alleged

agreement in 1864. He kept silent, though he knew he was the only one who knew of the alleged trust. He permitted the heirs of Dempster to deal with his alleged property and made no protest or objection and did not inform them of the alleged trust, and now, after this lapse of time, he cannot claim relief. His conduct amounts, in law, to acquiescence, and he will be bound by it.

The excuse complainants, the heirs of Benson, give for not calling for an accounting is, that Benson, their father, "was intimately acquainted with said John Dempster, and had great faith in his integrity, and trusted implicitly that said Dempster would promptly and properly report and account for and turn over to him the balance, if any, of said property." When John Dempster died, in 1863, it is alleged "that there remained no surplus to account for to said Benson, but, on the contrary, a deficit, leaving him still in debt to said John Dempster, his heirs or legal representatives." How, then, can this be offered as an excuse for this long delay? He could not expect Dempster to account for the increase in value of the property after his decease, and Dempster's heirs knew nothing of his claim, from anything that appears in the bill. The bill alleges that ever since the probating of Dempster's estate his heirs have claimed to hold the title to said property by descent from said Dempster. This allegation is, in effect, that for thirty-five years the defendants, the heirs of Dempster, have been in the open and adverse possession of this property.

Angell on Limitations (sec. 174) says: "Though it has invariably been maintained that the Statute of Limitations does not apply directly to trusts of the nature above considered, yet it has ever been as invariably maintained that if a trustee should deny the right of his *cestui que trust*, and assume absolute ownership of the property he holds in trust, he abandons his fiduciary character, and the *cestui que trust* must commence legal proceedings against him within six years therefrom. * * *

'When,' says Mr. Justice Story, 'it is said that the Statute of Limitations does not apply to cases of trust, it is material to consider the sense in which that proposition is to be understood.' He then says, that 'even in cases of express trusts, if an open, public, adverse claim is set up by the trustee against his *cestui que trust,* and the trust itself is denied as any longer subsisting, there is much reason to hold that the bar ought to be admitted to arise from that period.' * * * In a case subsequently decided by the same learned judge, he gives his opinion that though the doctrine that a positive and technical trust is not barred by lapse of time is regularly true, yet the doctrine is subject to two qualifications, namely: that no circumstances exist to raise a presumption from lapse of time of an extinguishment of the trust, and that no open denial or repudiation of the trust is brought home to the knowledge of the parties in interest which requires them to act as upon an asserted adverse title."

In the case of *Philippi* v. *Philippi,* 115 U. S. 151, the rule laid down is applicable to the case at bar: "It is true, as a general rule, that when the relation of trustee and *cestui que trust* is uniformly admitted to exist, and there is no assertion of adverse claim or ownership by the trustee, lapse of time can constitute no bar to relief. But when the trust relation is repudiated, or time and long acquiescence have obscured the nature and character of the trust, or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance, in all such cases a court of equity will refuse relief on the ground of lapse of time and its inability to do complete justice."

In the case under consideration both Benson and Dempster, the two parties to the transfer and the only persons who knew the facts, are dead, and what was said in the case of *Hammond* v. *Hopkins,* 143 U. S. 224, is pertinent here. There the trustee under the will of a deceased partner was called to account for and to turn over cer-

tain land purchased by him in the name of a third person for himself, as trustee, and the court say: "In all cases where actual fraud is not made out but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollections of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence. The hour glass must supply the ravages of the scythe, and those who have slept upon their rights must be remitted to the repose from which they should not have been aroused." And at page 250: "The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transaction having become so obscured by time as to render the ascertainment of the exact facts impossible."

A case similar, in some respects, to the case under consideration is the case of *Brown* v. *Brown*, 154 Ill. 35. It was there said (p. 43): "But, independently of other considerations, the *laches* of complainants precludes a recovery. Where a party has slept upon his rights or acquiesced for a great length of time a court of equity will refuse relief. The rule adopted in *Carpenter* v. *Carpenter*, 70 Ill. 457, *Dempster* v. *West*, 69 id. 613, *Walker* v. *Carrington*, 74 id. 446, and other like cases, applies here. As has been seen, the deed was made in August, 1865, and recorded in December, 1865, but this action was not brought until November, 1891. For a period of over twenty-six years complainants acquiesced in the conveyance. The complainants pretend ignorance of the fact that the defendant was claiming under the deed. They knew the deed had been executed and delivered. They received a consideration for the deed. They knew, or at least were bound to know, the deed was on record. They also knew, or by the exercise of ordinary diligence might have

known, that the defendant was in the control of the property under the deed. There was therefore no excuse for a want of knowledge that the defendant was claiming under the deed. Moreover, the complainant Lemuel Brown admits, in his evidence, that he learned that the defendant was claiming under the deed after his return from Iowa, which was nine or ten years ago. After learning of that fact he allowed seven years to intervene before bringing an action. The delay was inexcusable."

A careful examination of the amended bill shows that no sufficient excuse is given for the delay of thirty-eight years between the alleged transfer and the death of Benson and the demand for an accounting by him. A demand must be made within a reasonable time or the claim will be considered stale and relief will be refused in a court of equity. The length of time which elapsed in this case was inexcusable, and no sufficient excuse is given in the bill for the long delay. The *laches* of Benson, under whom complainants claim, must be held a bar to any recovery interposed by complainants in the bill.

The decree of the superior court will be affirmed.

*Decree affirmed.*