JOHN A. CARLOCK, Conservator, Plaintiff in Error, *vs.* W. B. CARLOCK, Defendant in Error.

*Opinion filed February 25, 1911—Rehearing denied April 6, 1911.*

1. DEEDS—*mere existence of fiduciary relation does not justify setting aside deeds.* The existence of a fiduciary relation between the grantor and grantee is not, of itself, ground for setting aside the deeds, where they were not procured through improper means or their execution attended with any circumstance of oppression or overreaching on the part of the grantee.

2. SAME—*when deeds will not be set aside for want of capacity to make them.* Deeds will not be set aside, in equity, upon the ground that the grantor was without capacity to make them, where the evidence shows that while the grantor was not as strong, mentally, as the average person, he was competent to and did transact the usual and ordinary business of a farmer, buying and selling personal property and borrowing money, and on several occasions testifying in court.

3. LACHES—*right to relief, in equity, is not dependent upon the lapse of any fixed period of time.* Where it is necessary to prevent fraud or great hardship, courts of equity will grant relief even after the Statute of Limitations applicable to actions at law has run; but in other cases, in order to accomplish the proper result, relief, in equity, may be denied though the period of limitation for actions at law has not expired.

4. SAME—*when relief by way of setting aside deeds is properly denied.* Relief, by way of setting aside deeds, is properly denied where the evidence establishes that the grantor and grantee were brothers; that the grantor was involved in domestic and financial difficulties and required the aid of the grantee, who, as business adviser and attorney, assisted in settling such difficulties; that the consideration for the deeds was all the land was worth at that time and that no fraud or imposition was practiced upon the gran-

tor, who for more than ten years after the deeds were made, (during which time the grantee's receipts and papers were destroyed by fire,) accepted the monthly payments from the grantee, which constituted part of the consideration for the deeds.

WRIT OF ERROR to the Circuit Court of McLean county; the Hon. COLOSTIN D. MYERS, Judge, presiding.

WELTY, STERLING & WHITMORE, for plaintiff in error.

LOUIS FITZHENRY, and BARRY & MORRISSEY, for defendant in error.

Mr. CHIEF JUSTICE VICKERS delivered the opinion of the court:

John A. Carlock, as conservator of A. H. Carlock, filed a bill against W. B. Carlock in the McLean county circuit court to set aside a quit-claim deed dated September 11, 1888, and two warranty deeds dated in 1895, all executed by A. H. Carlock to W. B. Carlock. The quit-claim deed purported to convey 200½ acres of land lying in McLean and Woodford counties and an undivided one-ninth interest in 80 acres adjoining. The first of the warranty deeds, which was dated March 1, 1895, and acknowledged on the 20th of the same month, conveyed that part of the land covered by the first deed which was located in McLean county. The third deed, dated March 15, 1895, conveyed that part of the land covered by the first deed which was located in Woodford county. The bill alleges as grounds for setting aside said deeds that the grantor, A. H. Carlock, was mentally incapable of comprehending and understanding the nature of the transaction; that a fiduciary relation existed between the grantor and grantee, and alleges fraud and undue influence. It is charged in the bill that when the warranty deeds were executed the land was worth $20,000 and that no consideration was paid for said deeds. It is also alleged that W. B. Carlock sold a large amount of per-

sonal property belonging to A. H. Carlock and retained the
proceeds, for which he should be required to account. The
bill charges that W. B. Carlock received $900 from the sale
of land belonging to A. H. Carlock and also received a large
amount of rent from said lands, for all-of which the de-
fendant should be required to account. The bill also alleges
that in 1888 the wife of A. H. Carlock filed a bill for sepa-
rate maintenance against A. H. Carlock and that the land in
question was conveyed to the defendant in trust. The an-
swer of W. B. Carlock charges that John A. Carlock was
not legally appointed conservator for A. H. Carlock and
denies his right to file the bill. The answer also charges
that the conveyance of 1888 was executed in pursuance of
a settlement of the separate maintenance suit and for the
purpose of barring the wife's right of dower, and to secure
W. B. Carlock for money paid and to be paid in settlement
of the separate maintenance suit, and for other purposes.
The answer admits the receipt of the proceeds of the sale
of personal property and rents from the land, but avers that
they have all been fully accounted for. The answer denies
that the land was worth $20,000; denies mental incapacity,
fraud and undue influence, and charges that defendant, in
March, 1895, had paid out for A. H. Carlock about $12,000,
and that he and said A. H. Carlock then and there had a
settlement of all matters between them, and that the de-
fendant purchased from A. H. Carlock the land in question
in consideration of the indebtedness to the defendant and
$500 in addition thereto, and an agreement upon the part
of W. B. Carlock to pay A. H. Carlock $15 per month dur-
ing his lifetime, and alleges that said agreement was carried
out by the execution and delivery of the deeds and by the
payment of the $500 and the $15 per month. The answer
also sets up and relies on *laches,* and denies that the com-
plainant is entitled to any relief by reason of the long de-
lay in filing his bill. The cause was referred to a master,
who took the evidence and reported the same to the court,

recommending a decree in favor of the complainant below. The court, however, by its decree dismissed the bill for want of equity, basing the decree upon the ground of *laches*. The complainant below has sued out a writ of error to have the decree reviewed by this court.

The facts disclosed by this record are, in substance, as follows: A. H. Carlock and the defendant in error are brothers, the latter being five or six years older than A. H. Carlock. W. B. Carlock is a lawyer and has been practicing his profession in McLean county for about forty years. A. H. Carlock obtained title to the real estate in question by descent from his father and resided thereon with his wife until domestic troubles arose which resulted in their separation, and his wife, with three daughters, went to reside in Chicago. She commenced a suit for separate maintenance against A. H. Carlock, and defendant in error represented his brother in that litigation. The separate maintenance suit was compromised by an agreement to pay the wife $2000, she agreeing to join her husband in the deed conveying all his real estate, so as to bar her dower. Subsequently A. H. Carlock filed a bill for divorce on the ground of desertion, which resulted in a decree of divorce being entered, and defendant in error was the solicitor for A. H. Carlock in the divorce proceeding. At the time his wife left him, A. H. Carlock was the owner of a considerable amount of personal property, consisting of live stock and other farm property. After the family was broken up A. H. Carlock attempted for a time to look after his farming interests but soon found that he could not manage his affairs satisfactorily, and accordingly a public sale of all the personal property on the farm was made and the farm was rented. A. H. Carlock was heavily indebted at the time the sale of the personal property was had. Aside from the $2000 due his wife in settlement of the separate maintenance suit he owed numerous other debts, aggregating sev-

eral thousand dollars. A portion of his real estate was encumbered.

Much evidence was introduced upon the question of the mental capacity of A. H. Carlock. A large number of witnesses who had known him practically all of his life testified on this question. While the evidence tends to show that A. H. Carlock was not as strong, mentally, as the ordinary intelligent person, still he was legally competent to attend to his own business affairs, and had managed his farm and transacted all kinds of ordinary business affairs on his own account and never required the aid or assistance of anyone except in connection with the litigation with his wife, in which defendant in error and other counsel repsented him. He had sufficient intelligence and memory to testify, and did testify, in court on different occasions. He bought and sold personal property, borrowed money, and in a general way did all of the usual and ordinary business of a farmer in his situation. Plaintiff in error does not contend that A. H. Carlock was insane or was so weak, mentally, that he could not transact ordinary business. The contention on this point is that he was weak and therefore more liable to imposition and fraud and more readily yielded to the undue influence which it is charged defendant in error exercised over him. There is no evidence that defendant in error practiced any fraud upon A. H. Carlock. The evidence does show satisfactorily that after the domestic trouble arose between A. H. Carlock and his wife defendant in error became active in the management, not only of the litigation, but also of the general business affairs of his brother. He was present at the sale of the personal property and actively aided in the sale and received all of the notes and cash given for the property sold. The exact amount which came into defendant in error's hands from the sale is not clearly established. There was no documentary evidence produced showing the total amount of the proceeds, and the witnesses differed as to their recollections

several hundred dollars. It is claimed on behalf of plaintiff in error that the sale amounted to $2000 while defendant in error claims that it was less than $1000, a part of which was paid with notes of A. H. Carlock which were held by purchasers at the sale. It is also shown that defendant in error received between $600 and $700 for the interest of A. H. Carlock in a tract of land which was sold by defendant in error. It is not disputed that the rents for the land in controversy were collected by defendant in error after the making of the quit-claim deed, in 1888, until the warranty deeds were made, in 1895. The rents collected by defendant in error during this period were something over $3000. Defendant in error paid a large number of debts for his brother prior to the making of the warranty deeds, in 1895. He claims that these payments amounted to $10,250. Many of the items in the list of debts paid are in dispute and the evidence is conflicting. In regard to several items there is no evidence except that of A. H. Carlock and the defendant in error, which is directly contradictory. Plaintiff in error concedes that defendant in error is entitled to credit for $6673.21 for money paid out for A. H. Carlock. The evidence shows that in 1900 defendant in error lost all of his receipts, books of account and other evidence of debts paid by fire, and in consequence of the destruction of his books and papers it was necessary to rely on the memory of witness as to the amounts of money paid and received.

At the time the warranty deeds were made, in 1895, the evidence shows that the two brothers had an accounting, and while they disagree as to the amount that was then settled upon as due defendant in error, it is clear that the amount, whatever it was, was settled and paid by the conveyance of the land in question, and such indebtedness, together with the $500 paid and the agreement of defendant in error to pay his brother $15 per month as long as he lived, formed the consideration for the conveyance of the

real estate. The amount due defendant in error at the time the deeds were made only becomes material in connection with the claim of plaintiff in error that the consideration paid for the land was inadequate. The testimony as to the value of the land conveyed at the time the warranty deeds were made is conflicting, but the weight of the evidence on this point shows that the consideration expressed in the warranty deeds was the fair cash value of the lands conveyed. The court below found that the price agreed upon was the fair market value at the time of the settlement. The total consideration mentioned in the two deeds is $13,-840, which is an average of $69 an acre. Some of the witnesses testify that the land was worth $75 an acre, while others placed it as low as $50. The greater part of the land is clay timber soil, has several ravines through it, is crossed by gulches and is divided by a public road. Twenty acres is detached from the balance of the farm. The evidence shows that the rental value of the land was only $600 a year. Our conclusion is, from the evidence, that the price agreed upon was as much as the land was worth at that time. The evidence shows that the land is worth considerably more now, due to a general advancement of real estate values in that locality. After the execution of the warranty deeds sought to be set aside defendant in error went into exclusive possession of the lands involved and has continued to occupy them by tenants ever since that day. He has paid all taxes and kept up repairs and collected the rents. He paid A. H. Carlock $500 and has paid him $15 per month every month since the deeds were made. A number of monthly payments have been made to the conservator since he was appointed. After conveying the lands to the defendant in error A. H. Carlock moved to Bloomington and has continued to reside there since. He has attempted at different times to carry on business in a small way but has usually been unsuccessful. He occupied a room and took his meals at restaurants. The $15 per month which

defendant in error has been paying him regularly, together with such amounts as he could earn by doing various kinds of labor, has been his means of subsistence since he moved to Bloomington.

The record in this case is very voluminous. It would be impracticable to attempt to state the facts in detail and it is not necessary to a decision of this case to do so. The evidence, while conflicting upon all the controverted questions of fact, fairly tends to sustain the contentions of defendant in error. When the length of time that has elapsed since the transactions under investigation occurred is considered, together with the destruction of all of the documentary evidence relating to them, we are satisfied that the evidence as to the payment of debts by defendant in error for A. H. Carlock is reasonably clear and satisfactory.

Much has been said upon the question of a fiduciary relation that is claimed to have existed between defendant in error and A. H. Carlock. We think the evidence shows the existence of such relation at the time the deeds were made, but that circumstance alone is not sufficient to warrant a court of equity in setting aside the deeds if they were not procured through improper means or their execution attended with any circumstances of oppression or of overreaching.

In his answer defendant in error has set up and relies upon the defense of *laches*. The bill was not filed in this case until a few months over ten years after the execution of the two warranty deeds and something over sixteen years after the execution of the quit-claim deed. The court below held that this long delay, unexplained, was a bar to the relief sought. There is no fixed time that is held to apply in bar of actions in equity. Where it is necessary to prevent fraud or great hardship, courts of equity will grant relief even after the Statute of Limitations applicable to actions at law has run, and in other cases courts of equity will sometimes, in order to accomplish a proper result, bar

the action in a shorter time than that prescribed by the statute. In *Elmore* v. *Johnson,* 143 Ill. 513, on page 534, this court said: "What is a reasonable time cannot well be defined, but must be left, in large measure, to the determination of the court in view of the facts presented. Equity does not always follow the period of limitation fixed by statute and enforced in courts of law. Parties will be required to assert their rights within a shorter time in States where the values of real estate increase rapidly and greater temptations are thereby afforded for speculative litigation. (*Burr* v. *Borden,* 61 Ill. 389.) But the party who is entitled to set the transaction aside cannot be charged with delay or with acquiescence or confirmation unless there has been full knowledge of all the facts and perfect freedom of action. Acts which might appear to be acts of acquiescence will not be held to be such if the client or *cestui que trust* is ignorant of the circumstances or under the control of the original influence, or otherwise so situated as not to be free to enforce his rights. (*Rogers* v. *Marshall,* 3 McCrary, 76; *Hawley* v. *Cramer,* 4 Cow. 717.) Confirmation may be evidenced by long acquiescence, 'as by standing by and allowing the purchaser to lay out money in the firm belief that his title would not be contested.'—*Pearson* v. *Benson,* 18 Beav. 598."

In *Benson* v. *Dempster,* 183 Ill. 297, this court, (p. 309,) in discussing the subject of *laches,* used the following language: "It is true, as a general rule, that when the relation of trustee and *cestui que trust* is uniformly admitted to exist and there is no assertion of adverse claim or ownership by the trustee, lapse of time can constitute no bar to relief. But when the trust relation is repudiated or time and long acquiescence have obscured the nature and character of the trust, or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance, in all such cases a court of equity will refuse relief on the ground of lapse of time and its inability to do complete justice.

* * * In all cases where actual fraud is not made out but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved and lapse of time has impaired the recollections of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence. The hour-glass must supply the ravages of the scythe, and those who have slept upon their rights must be remitted to the repose from which they should not have been aroused. * * * The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transaction having become so obscured by time as to render the ascertainment of the exact facts impossible."

In *Dempster* v. *Rose Hill Cemetery Co.* 206 Ill. 261, at page 271, this court used the following language: "One important principle involved in the term *'laches'* is, that after a long lapse of years, during which testimony is impaired or destroyed, witnesses remove or die * * * and papers, letters, documents, books, records, etc., are lost or destroyed, * * * the defendant is at the complete mercy of any claimants who may wish to take advantage of the situation. Time impairs and destroys evidence of the true facts and makes it practicably impossible to meet positive testimony of the complainants, whether the same be true or untrue. A court of equity, therefore, finding itself unable to render substantial justice between parties, asserts the principle of *laches* on the ground of public policy and for the repose of property rights."

The reasoning in the foregoing cases applies with great force to the situation presented by this record. Here the evidence shows that defendant in error found his brother involved in domestic and financial difficulties from which he was unable, without assistance, to extricate himself. De-

fendant in error, being his brother, was called upon to give help and promptly responded. He at once saw that if some one did not come to his aid his brother's property would be swept away by the claims of creditors and he would be left penniless. Acting, apparently, from a desire to save something out of his wrecked fortune which would help to support him, defendant in error undertook to clear up all of his debts and gave him an annuity of $15 per month as long as he lived. This arrangement was satisfactory to A. H. Carlock at the time. He had all the facts before him then in relation to the debts that were to be paid that he has now. He had sufficient intelligence to understand his situation fully and to comprehend the nature of the contract he was entering into, and while it is true that defendant in error was his attorney or had been his attorney, and occupied at that time a fiduciary relation to him, yet the record shows that there was no attempt to take advantage of the confidence which the relation of the parties imposed. If defendant in error has profited to the amount of anything as the result of his dealings with his brother it is due to the enhanced value of the land conveyed. After waiting more than ten years, during which time the $15 per month has been regularly paid and which has constituted a substantial portion of his income, it is inequitable to permit A. H. Carlock to now have the deeds set aside in order that he may obtain the benefit of the advance in the value of the lands since he conveyed them. During this long delay a fire has occurred which has destroyed the documents that would be conclusive of a number of the disputed matters in controversy.

In our opinion the court below properly dismissed the bill because of the long delay in taking steps to set aside these deeds. Its decree will consequently be affirmed.

*Decree affirmed.*