(No. 18476.—

JULIA NEAGLE *et al.* Appellants, *vs.* MARY A. McMULLEN, Exrx., *et al.* Appellees.

*Opinion filed February 20, 1929—Rehearing denied April 3, 1929.*

GEORGE E. SANKSTONE, GEORGE F. ORT, and EDWARD H. S. MARTIN, for appellants.

THOMAS J. YOUNG, and WILLIAM H. HOLLY, for appellees.

Mr. COMMISSIONER PARTLOW reported this opinion:

Appellants, Julia Neagle, Mary Manning and Agnes Carroll, who are sisters, filed their bill in the circuit court of Cook county against their sister-in-law, Elizabeth Neagle, to establish a constructive trust in certain real estate at the corner of Halsted and Polk streets, in the city of Chi-

cago. Upon issue being joined the cause was referred to a master to take the evidence and report his conclusions. After she had testified, but before the final determination of the case, Elizabeth Neagle died, and appellees Mary A. McMullen, personally and as executrix of the will of Elizabeth, and Alice Atkinson, Agnes A. Ducey and William T. McMullen, were substituted as defendants. The master found that Elizabeth paid $20,500 for the property, which was valued at $25,000; that she had no actual notice of the alleged trust but that she had constructive notice thereof through her attorney, Frank P. Reynolds; that she was equitably vested with an indefeasible title to eighty-two per cent of the property, and the other eighteen per cent was impressd with a trust in favor of appellants. Exceptions to the report were sustained, a decree was entered dismissing the bill for want of equity, and an appeal has been prosecuted to this court.

The questions for determination are: (1) Was a trust created in John F. Neagle in the property in question under a deed to him from his father, Francis C. Neagle, dated March 6, 1895? (2) If such a trust was created by said deed, did it continue to exist and did Elizabeth Neagle acquire title to the property subject to it and with notice of its existence? (3) Were appellants guilty of such *laches* as barred a recovery under their bill?

The evidence shows that Francis C. Neagle died testate in Cook county on July 20, 1895, leaving as his only heirs-at-law his widow, Johanna Neagle, three daughters, who are the three appellants, and two sons, John F. and Frank H. Neagle. The widow and Frank died intestate in 1899, leaving appellants and John as their only heirs-at-law. Prior to his death Francis C. Neagle was the owner of the real estate in question subject to two mortgages on separate parts thereof, one for $9000 and the other for $6000. On February 9, 1895, he made a will, in which he devised to John in fee a piece of real estate not in controversy. He

devised the real estate in question to John as trustee, to hold for twenty-one years after his death, when it was to become the property of appellants. The trustee was to collect the rents, pay expenses and use such part of the income as might be necessary for the support of the widow, appellants and Frank. On the same day the will was executed the testator executed a quit-claim deed conveying to John the real estate devised to him in fee by the will. On March 6, 1895, the testator conveyed the real estate in question to John without reservations or conditions in the deed. This deed is the basis of appellants' claim in this case.

The testator and his sons had been engaged in general contracting in Chicago under the firm name of F. C. Neagle & Son Company. On March 8, 1895, this business was incorporated, all of the stock being owned by the father and his sons. The evidence shows that the firm and corporation were financially involved and several suits were pending against them. After the death of the testator the will was filed for probate. The inventory showed $537.75 of personal estate and no real estate. Claims were allowed amounting to $5293.91, which were not paid. On March 6, 1896, John conveyed the real estate in question to the corporation for a stated consideration of $20,000, together with the real estate which he acquired in fee on February 9, 1895, from his father, the consideration being stated as $5000. Foreclosure suits were filed on the two mortgages. John was made a defendant in each and was represented by Frank P. Reynolds, his solicitor. Appellants were not defendants and did not appear in the cases. There was a sale under the $9000 mortgage to the complainants in that case for $10,000, with a deficiency of $498.60. The certificate was assigned to Reynolds and he secured a deed on April 25, 1901. Under the $6000 mortgage there was a sale to complainants in that case for $7400, with a deficiency of $301.50. A master's deed was issued to the complainants on March 23, 1901, and there was a subsequent

conveyance of this property to Reynolds on April 20, 1901, for a stated consideration of $6500. Reynolds had been attorney for the Neagle family for a number of years. He had represented Elizabeth Neagle just prior to her marriage to John. Elizabeth was the widow of Eugene Keogh, who died May 23, 1888. She married John on February 12, 1901. She was the owner of one-sixth of an estate valued at $500,000 which she inherited from her father. She was introduced to John by Reynolds. She testified that a few days before her marriage she went to the office of Reynolds by appointment with John, their offices being together. Reynolds told her she had some money in the bank which he could invest for her and that he had a good investment at the corner of Polk and Halsted streets. Later John came in and said it was a good investment. She decided she would purchase the property. She testified that a few days afterwards she was married, and on her wedding day, at the depot, shortly before taking the train, she delivered a check for $10,000 either to John or Reynolds. She could not recall upon what bank it was drawn, but it was either on the Graham & Sons Bank or the Merchants Loan and Trust Company. As further consideration for the purchase, on April 9, 1901, she conveyed to Reynolds a house and lot on Green street, in Chicago, which she testified was worth $3500. On February 7, 1901, she received $9426 from the clerk of the circuit court through her attorney, Reynolds, by virtue of a court order entered just prior thereto. Reynolds, in consideration for the assignment of the certificate and the making of the deed to the property to him, paid part cash and conveyed the Green street property for $4500. Afterwards he executed two trust deeds on the property in question to the Merchants Loan and Trust Company, totaling $7000. On December 15, 1902, he conveyed the real estate to Elizabeth for a stated consideration of $25,000, subject to the $7000 trust deeds, which she assumed and agreed to pay.

There is evidence tending to show that immediately after the marriage of John F. Neagle and Elizabeth Keogh he and his sister Julia, one of the appellants, assumed the management and control of all of Elizabeth's real estate and business affairs, including her bank account. Julia collected a part of the rents not only from the Halsted street property but from all of the property belonging to Elizabeth. Elizabeth signed checks, notes, leases and mortgages at the dictation of her husband. She put mortgages on her property and she never received the proceeds. From 1901 to 1911 the average rental from the property was $590 per month, out of which Julia claims John paid her and her sister Agnes about $65 a month. From 1911 to 1918 Julia collected rents ranging from $250 to $590 a month. She claims she retained for her sister and herself from $75 to $100 a month and at the direction of John deposited the balance in the name of Elizabeth. John and his wife lived in Chicago until 1911, when they moved to Florida, where they lived until the death of John, on April 5, 1922.

J. J. Sankstone, the notary public who acknowledged the warranty deed of March 6, 1895, from Francis C. to John F. Neagle for the property in controversy, testified that Francis was ill in bed at his home on Park avenue, in Chicago, at the time the deed was executed; that John said: "Father, I have brought Mr. Sankstone. I had a deed prepared to the Halsted and Polk street property at your suggestion to avoid probating this property—put the title in me. I will hold it for the girls, as you requested." Mrs. Johanna Neagle said, "That would be a good suggestion." Francis said: "Now, John, of course you have had a good deal of my support and I have taken care of you pretty well. Now this property I intend should go to my children. [Mentioning the three girls and Frank.] Mother will have the home here." The father handed the deed to John and said, "I know you will take care of it." The family lived on the premises until a home was built on Park avenue.

They lived on Park avenue until the death of the testator. When foreclosure proceedings were instituted against the Park avenue property the family moved elsewhere.

In corroboration of the testimony of Sankstone, evidence was offered of conversations between Francis and John, in which the father, some time after the date of the deed, is alleged to have stated that he had arranged so that his wife and children would be taken care of out of the Halsted street property, and John replied that the income from that property would be enough and he would take care of them. Daniel S. Ellsworth testified that he talked with John many times during a period of about twelve years, and John always told him the income from the property was for his sisters and they did not care to sell the property. Upon cross-examination he admitted that John gave him to understand that his sisters were the owners of certain property on Harrison street, and John never told the witness that his wife owned the Oak Park property but always gave him to understand that John owned it. These last two properties belonged to Elizabeth. Another witness testified that he paid Julia $35 out of rent which he had collected, and when he told John about it John said that was all right; it went to them anyway. Julia testified that in 1911 John delivered some leases to her made out in the name of Elizabeth and she asked him about them; that it aroused her suspicions but she never took the matter up with Elizabeth; that in 1914 her sister Mrs. Manning demanded her share of the rents and told Julia the property was not in their names, and Julia then understood that it ought to be conveyed to her and her sisters. Evidence was offered as to conversations between John and appellants, in the presence of Elizabeth, in which reference was made by John to the property and the income therefrom in such a manner as to give notice to Elizabeth that appellants were claiming an interest in the property or in the income therefrom. Elizabeth denied that she was present when any

such conversation took place. She claims she did not know anything about the trust agreement before she purchased the property and did not know that any part of the rents was retained by Julia or that any part of it had been paid by John to Julia. After the death of John a controversy arose between the parties as to the title, and about three months after his death this suit was instituted.

The contention of appellants is that John took title impressed with the trust and that Elizabeth took title with knowledge of the trust, either actual or constructive, and that it is binding upon her. Where it is sought to establish a constructive trust by parol evidence the proof must be clear, convincing, and so strong, unequivocal and unmistakable as to lead to but one conclusion. Many of the cases hold that the proof must be clear beyond a reasonable doubt. If the evidence is doubtful or is capable of reasonable explanation upon theories other than the existence of a trust it is not sufficient. (*Niland* v. *Kennedy,* 316 Ill. 253; *Conroy* v. *Conroy,* 313 id. 127; *Winkelman* v. *Winkelman,* 307 id. 249; *Baughman* v. *Baughman,* 283 id. 55; *Ryder* v. *Ryder,* 244 id. 297.) To establish a constructive trust there must be some element of fraud, either positive or constructive, which existed at the time of the transaction, or there must be a confidential relation and undue influence, by virtue of which one has obtained the legal title to property which he ought not to have secured under the rules of equity and good conscience. (*Streeter* v. *Gamble,* 298 Ill. 332.) The mere breach of the grantee's oral promise does not constitute such fraud as takes the case out of the Statute of Frauds. (*Delfosse* v. *Delfosse,* 287 Ill. 251; *McHenry* v. *McHenry,* 248 id. 506.) A fiduciary relation exists where there is a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence. It exists where confidence is reposed on the one side and resulting superiority and influence are found on

the other side. (*Niland* v. *Kennedy,* supra; *Campbell* v. *Freeman,* 296 Ill. 536; *Feeney* v. *Runyan,* 316 id. 246.) Even if a fiduciary relation exists, unless by means of that relation undue advantage is taken of the grantor the conveyance will not be affected. (*Pillsbury* v. *Bruns,* 301 Ill. 578; *Roche* v. *Roche,* 286 id. 336; *Kellogg* v. *Peddicord,* 181 id. 22.) A deed is valid if it is executed with full knowledge of its nature and effect and through the deliberate and voluntary desire of the grantor. (*Pillsbury* v. *Bruns, supra.*) Where a fiduciary relation exists, the burden is on the beneficiary to show the fairness of the transaction and that it did not proceed from undue influence. (*Allen* v. *McGill,* 311 Ill. 170; *Rutherford* v. *Schneider,* 307 id. 28.) A fiduciary relation does not necessarily arise out of the relation of parent and child. *Niland* v. *Kennedy, supra.*

The evidence conclusively establishes the following facts: On March 6, 1895, when the deed to John was executed, there were two mortgages on the property, totaling $16,000. In the foreclosure proceedings one decree was for $10,498.60 and the other was for $7701.50, making a total of $18,200.10. Elizabeth paid $10,000 in cash, assumed two trust deeds amounting to $7000, conveyed the Green street property valued at $3500, (which was subsequently conveyed for $4500,) making a total of $20,500 or $21,500, which was substantially all the property was worth. When Francis conveyed to John, Francis was in financial difficulty. All of his real estate was mortgaged and was subsequently lost under foreclosure proceedings. He owed debts which he was unable to pay, some of which were later reduced to judgment. Several suits were pending against him. John apparently had no property, and judgments aggregating several thousand dollars were later rendered against him. The inventory of the estate of Francis showed no real estate and only $537.75 of personal estate. Claims amounting to $5293.91 were allowed, none of which were

paid. From all of these undisputed facts it is apparent that Francis was a bankrupt, and if all of his debts had been paid he would have left no estate which could have been held in trust for his wife and children. Any trust agreement that may have been made was destroyed by the foreclosure proceeding, as far as the mortgagees were concerned. It was only by reason of the purchase by Elizabeth out of her own funds that this property did not pass into the hands of strangers.

John had lived with his father all of his life prior to his marriage to Elizabeth. Their business and family relations had been close and intimate. They had always been on friendly terms and each had confidence in the other. Whether a fiduciary relation existed between them and whether John abused that relation to secure this deed depends upon the facts in evidence. It is undisputed that the father was mentally sound and was not easily influenced. Julia testified that "father had a very strong individuality and strength of mind; anything he set his mind to do he did." If the deed was the free and voluntary act of the father no constructive trust was created. The principal evidence on which the trust was based was the testimony of Sankstone. He testified to the language used by the father over twenty-seven years earlier. It is difficult to understand how the witness could remember even the substance of the conversation after so many years in the absence of anything to impress it upon his mind. Even if full faith and credit is given to his evidence, there is considerable doubt, from the language used, as to whether the deed was made at the suggestion of John or whether it was made at the suggestion of the father. The meaning of the statement made by the father at the time the deed was executed depends on the manner in which it was made, and when it is reduced to writing its meaning depends on the manner in which the statement is punctuated. If the statement means that at the suggestion of the father the

deed was prepared so as to avoid administering the estate, such a construction would not sustain the contention that John was the moving spirit and that he influenced his father to make the deed. If the statement means that John was the moving spirit and had the deed prepared and secured Sankstone to acknowledge it there might be some merit in the contention of appellants. The language testified to by Sankstone does not clearly indicate the creation of a trust agreement.

Other evidence casts doubt on the weight to be given the evidence of Sankstone. He was asked on cross-examination as to certain other instruments which he had prepared and acknowledged for the father, including the deed to John on February 9, 1895. He was not so clear as to these transactions and could not remember them as vividly as he did the one in question. He testified that he was a lawyer and had been admitted to the bar and had practiced in Chicago for many years. Evidence was offered showing that he was not a lawyer and had not been admitted to the bar, and yet he had practiced law for many years. He had been active in this case and had appeared in court on several occasions and had argued motions. His son was a lawyer and he had offices with his son. He had consulted with appellants and advised them as to their rights. His son and other lawyers engaged in the case had it on a contingent fee, and he was apparently interested in its success. This evidence shows that he was not a totally disinterested witness, and this fact should be considered in determining the weight to be given to his evidence.

Appellants insist that for many years John recognized the existence of this trust by making monthly payments to two of his sisters. The principal evidence with reference to these payments was from Julia, one of the appellants. There is some other evidence with reference to them but she went into the greatest detail. We have examined her evidence with considerable care and have serious doubts as to

the weight to be given to it. She was associated with John for over twenty-five years in the handling of this and other property belonging to Elizabeth. There is no question but that Julia received money from collections. She testified that this money was a part of the rents from this property, but there is considerable doubt on this point. The money may have come from the rents of the property in question and it may have come from rents of other property belonging to Elizabeth. She testified she did not know that her father had deeded the property to John; that she did not know of the proceedings in the probate court under her father's will, or of the foreclosure proceedings, or of the deed to Elizabeth. All of these proceedings were matter of public record, and the deeds were filed for record at the time they were executed. She testified that her father told her on his death-bed that he had made a will turning over the property for their benefit; that John was named as executor and would manage everything. Her father did not tell her of the oral declaration of trust which was supposed to have been made after the execution of the will. She testified that she knew John was appointed executor, and she left the matter of the probate to him. From this evidence it is apparent that she did know of the probate proceedings notwithstanding her evidence to the contrary. In January, 1898, a subpœna was served on Agnes Neagle with reference to a claim filed in the probate court against her father's estate. Julia testified that in 1911 John gave her some leases made out in the name of Elizabeth and she asked him about them; that this aroused her suspicion that her rights were being infringed upon, but she never took the matter up with Elizabeth. In 1914 Mrs. Manning demanded her share of the benefits and told Julia the property was not in their names, but it was not until after the death of John, when his widow began to assert her rights and Julia saw her support slipping away, that she took any action. She then consulted Sankstone, who looked up the

records, advised her that the property belonged to appellants, and this suit was instituted. If the testimony of Julia and Sankstone is removed from this case there is very little evidence left on which a decree establishing a trust can be based. When their testimony is considered as a whole it is not of that clear and convincing character necessary, under the authorities cited, to establish a constructive trust, nor is all of the evidence sufficient to establish such a trust.

Even if the evidence were sufficient to establish a constructive trust, before appellants would be entitled to a decree it was incumbent upon them to prove that Elizabeth, before she purchased, had notice of the trust, either actual or constructive. The master found that she had no actual notice, and that finding is amply sustained by the evidence. The master found that she had constructive notice through her attorney, Reynolds, which finding was not sustained by the chancellor. Elizabeth did not seek to acquire this property. Her attention was called to it by Reynolds prior to her marriage to John. There is no evidence that she had any knowledge as to the condition of the title prior to the time she purchased. There is no substantial evidence that she knew very much about the title after she purchased. She was not a party to a fraud to defeat the title of appellants. She apparently purchased in good faith for full value. Reynolds paid $11,280.08 for one certificate under the foreclosure and $3000 in cash and the Green street property for the other certificate. He paid a total of $14,280.08 cash and deeded the Green street property to the holders of the certificates. He put a mortgage on the property for $7000. When he sold it to Elizabeth he received from her $10,000 in cash and received $7000 on the mortgage, or a total of $17,000 cash. He only paid $14,280.08 cash to the parties from whom he acquired the title. Where the difference of $2719.92 went the evidence does not show. It must have gone either to John or Reynolds. If either or both of them got it they cheated Elizabeth out of it. She,

however, is charged by appellants with constructive notice of a trust through her agents, one or both of whom cheated her in the deal. Notice to an agent is not notice to the principal where the facts in the possession of the agent authorize the inference that he will conceal the information from his principal. (*Merchant's Nat. Bank* v. *Nichols & Shepard Co.* 223 Ill. 41; *Booker* v. *Booker,* 208 id. 529; *Seaverns* v. *Presbyterian Hospital,* 173 id. 414.) If Elizabeth had knowledge of the existence of the alleged trust, either actual or constructive, she probably would not have purchased the property. If there was such a trust and John and Reynolds wanted her to buy the property and pay full value for it, or if they wanted to buy the property to avoid the trust, it was not to their interest to tell Elizabeth about the trust. If Elizabeth had no knowledge of the trust and purchased, paying full value, the trust cannot be enforced against her. We do not think the evidence establishes notice to Elizabeth.

Equity does not encourage stale claims. (*Moore* v. *Taylor,* 251 Ill. 468.) This rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transaction complained of, or by reason of the original transaction having become so obscure by time as to render the ascertainment of the facts impossible or extremely difficult. (*Carlock* v. *Carlock,* 249 Ill. 330.) While the general rule is that to charge a party with *laches* in the assertion of an alleged right it is essential that he should have had knowledge of the facts upon which he based his claim, yet if the circumstances are such as to have put him upon inquiry, and the means of ascertaining the truth were readily available upon such inquiry but the party neglected to make it, he will be chargeable with *laches* the same as if he had known the facts. (*Ater* v. *Smith,* 245 Ill. 57.) Elizabeth, through her tenants, was in possession after the date of her deed. Julia was intimately connected with the property all

of that time and knew the way it was handled. As early as 1911 she knew that leases were being made in the name of Elizabeth. In 1914 Mrs. Manning called her attention to the fact that the property was not in the names of appellants. It is apparent that appellants either had notice as to the condition of the title or by the exercise of any degree of diligence they could have ascertained the true facts. They took no steps to assert their rights and waited for over twenty-seven years after the deed was executed to John before they took any action. During this time the two witnesses who knew most about the transaction had died and other evidence was destroyed or could not be located. We are of the opinion that appellants were guilty of such *laches* as barred a recovery even though they proved their case as to the existence of the trust and notice to Elizabeth.

It is insisted by appellants that the chancellor, by sustaining all of the exceptions of appellees to the report of the master, struck out certain important evidence which he did not consider. This is not the reasonable construction to be placed upon the ruling. The chancellor sustained the exceptions of appellees to the master's report but did so on the whole record and from a consideration of all of the evidence.

It is insisted that considerable incompetent evidence was introduced by appellees, and under the decree appellants are charged with unnecessary costs. It may be that some incompetent evidence was admitted but it was not confined to one side, and there was not as much incompetent evidence admitted as is claimed by appellants.

We find no reversible error, and the decree will be affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*