(No. 20791.—

JANE SIMPSON *et al.* Appellees, *vs.* MARY MANSON, Appellant.

*Opinion filed October 23, 1931.*

GEORGE D. KIMBALL, for appellant.

HARRY C. KINNE, and JOSEPH H. McGARRY, for appellees.

Mr. COMMISSIONER EDMUNDS reported this opinion:

On February 2, 1924, Edward J. McGarry filed a bill in the superior court of Cook county for partition of certain real estate on East Seventy-fifth street, in the city of Chicago, hereinafter referred to as the Seventy-fifth street property. On February 15, 1924, Jane Simpson filed a bill in the same court to cancel a quit-claim deed to said property executed by her September 7, 1923, and also praying partition and full and complete accounting. On February 18, 1924, Elizabeth Emerson filed a bill in the same court to cancel a quit-claim deed to said property given by her and her husband and Martin McGeary and his wife on April 21, 1905, and also praying partition and full and complete accounting. These suits were consolidated. Mary Manson, named as defendant in all the bills, filed an answer, and also a cross-bill praying that all records of the probate court of Cook county and the county recorder showing an interest in other persons be removed as a cloud on her title to the property. The cause was referred to a master, who heard evidence, found that the above mentioned deeds had been obtained by fraud and recommended that a decree be entered in accordance with the prayers of the bills. From a decree so entered Mary Manson has appealed.

On October 2, 1892, Annie T. McGeary died seized of said property. She left a will, which, after making several specific bequests, including a piano and music to Mary Emerson, daughter of Elizabeth Emerson, provided as follows: "I give, devise and bequeath all the rest, residue and remainder of my estate—real, personal and mixed, wheresoever situate, to my sister, Mary Manson, of Chicago, Cook county, Illinois, her heirs, executors, administrators and assigns in trust, however—to, upon and for the uses, trusts, intents and purposes, and with and subject to the limitations and conditions hereinafter mentioned, that is to say, to take possession of my real and personal estate, collect the rents, issues and profits thereof, as well as interest on my bond, notes, mortgages or other securities; and after payment of all taxes, insurance, repairs and all other necessary expenses, to apply the surplus or such part thereof as may be necessary to the care, nurture, support and maintenance of my beloved mother, Ann McGeary, in such manner as may be suitable for her in her condition of life; and after her death to see that she be properly interred." The will gave appellant power to sell realty and personalty, the proceeds of such sale or sales to be applied toward the support of the mother, if necessary, and the remainder to be re-invested. It also provided as follows: "It is my will that after the death of my beloved mother that my estate so held in trust by my trustee aforesaid, be divided among my brothers and sisters, Martin McGeary, Michael McGeary, Elizabeth Emerson, and Mary Manson, share and share alike, the heirs of any one of whom who may have deceased in the meantime to take the share to which said decedent would have been entitled."

Upon the death of Annie T. McGeary appellant took possession of the Seventy-fifth street property and also of another parcel of real estate owned by Annie on Dickson street. The Seventy-fifth street property was then encumbered by several mortgages, aggregating in amount $4000.

A two-flat frame, stove-heated building thereon was unfin-
ished but was completed by appellant. Appellant collected
all the rents from the Seventy-fifth street and Dickson street
properties and paid all interest, taxes and expenses. She
sold the Dickson street property in 1896 for about $2400.
She listed the Seventy-fifth street property for sale, but it
was not sold. Subsequently she paid off the $4000 en-
cumbrances. She never accounted to the residuary legatees
or their heirs for the rents collected or for the proceeds of
the Dickson street property, nor was any accounting ever
demanded of her until the institution of the present suits.
The master found the building on the Seventy-fifth street
property to be, at the time of the hearing, nearly forty
years old and in a bad state of repair, but further found
the present value of the property to be about $20,000, "on
account of increase in value of vacant property in that
part of Chicago." After Annie's death the mother stayed
part of the time with appellant, part of the time with
Elizabeth Emerson and part of the time at a hospital. Ap-
pellant paid the hospital expenses, and when the mother
stayed at Elizabeth's appellant paid or credited Elizabeth
with $10 per month for the mother's board. The mother
died intestate on April 27, 1901. The above named residu-
ary legatees were all living at that time. Michael McGeary
died intestate on September 15, 1901, leaving as his heirs
the above named residuary legatees who survived him, and
also Jane Simpson, a half-sister, complainant herein, and
Patrick McGarry, a half-brother. Patrick died intestate
on July 28, 1904, leaving Edward J. McGarry, the origi-
nal complainant herein, and others, as his heirs.

At the hearing appellees introduced in evidence the
following letter, written October 19, 1904, by Bastrup &
O'Neill, attorneys, to Martin McGeary: "We have writ-
ten you several times in reference to the property 105-75th
street, before putting Mrs. Manson to the expense and
trouble of straightening up the matter and in order to pre-

vent the expense incident to foreclosure. We would like to see you, and we would like to see you this week. Please call at our office and see Mr. O'Neill and he will talk the matter over with you, and oblige." Hugh O'Neill, who had not acted in the administration of Annie's estate, testified that he was appellant's attorney at the time he wrote the letter; that he drew the quit-claim deed which the Martin McGearys and the Emersons subsequently executed; that there were several conferences, participated in by witness, appellant and the Emersons, before it was executed; that there was some discussion about Michael McGeary's death and the possible interest of his heirs; that Mrs. Emerson stated she would not sign the deed until appellant released Emerson from a claim of $100 which appellant had against him; that witness told Martin McGeary that under the will Martin had a vested remainder, which could only be conveyed by deed; also that Michael had an interest as a vested remainderman which would go to Michael's heirs, of whom Martin was one, and before the title could be put in appellant's name Martin would have to sign the deed; that witness told Mrs. Emerson that she had a remainder under the will and that she also had an interest as heir of Michael, which entire interest she could convey by quit-claim deed; that appellant said in Mrs. Emerson's presence that the Seventy-fifth street property was very heavily encumbered and that she had been paying charges and taxes on the property and at that time it was not more than good security for the indebtedness or what she had paid out in handling it; that Emerson stated he had seen it; that appellant asked Mrs. Emerson to see the property and say what should be done with it and see at that time that all debts had been paid by her, what bills had been paid and what the carrying charges were, claiming that she had spent more money than the property would represent; that appellant mentioned in this connection specific amounts of money, which witness could not recall at the time of tes-

tifying; that appellant told Mrs. Emerson "she wanted a quit-claim deed to the property—to become the owner of it;" that appellant said it would not reimburse her for all the expenditures and she wanted a conveyance of the title to her, and that Emerson said he thought it would not be worth much more than what was against it.

Elizabeth Emerson testified that at the time of the death of her mother she lived near the Seventy-fifth street property, passed it very often and was often in the house; that at the time the quit-claim deed was executed appellant said the property was about to be foreclosed on a mortgage and appellant was about to lose it and wanted witness and her husband to sign the deed, which they did in the lawyer's office; that witness did not know anything about her interest in the property and knew nothing about it until 1923, when appellant told her she had been to New York looking up Patrick's heirs, and that witness never heard of a will of Annie T. McGeary or any explanation at all about it. Appellant's testimony as to what she told Mrs. Emerson at the time she asked for the deed was in substantial accord with that given by Mrs. Emerson.

Elizabeth M. Hussey, appellant's daughter, testified that Elizabeth Emerson received Annie's piano; that it was in Mrs. Emerson's home; that Mrs. Emerson's daughter, Mary, received Annie's books, library and book case, and that a month or two after Annie's death Mrs. Emerson said there were some payments due on the piano which Mrs. Emerson thought should have been paid out of the estate. Witness further testified that from the time of Annie's death witness and her mother kept a record of receipts and disbursements covering the Seventy-fifth street and other estate property, witness keeping the record in a book, making every entry in ink; that the last time she saw the book was in 1913; that at the time of Ann McGeary's death, in 1901, between $6000 and $7000 more had been expended by appellant than had been received; that

the Seventy-fifth street premises would be rented in the summer, and in the fall tenants would move out because they could not keep the flats warm; that the lower flat was vacant during the time of the World's Fair and was rented very little for the first five or six years; that the highest rate of rental before 1901 was $14 or $15 per month, and that Martin McGeary visited appellant at the premises many times and often discussed the matter of the property with appellant after the death of Ann.

The quit-claim deed executed by the McGearys and Emersons conveyed "all interest" in the Seventy-fifth street property to appellant. It contained the following recital: "The said Martin McGeary and Elizabeth F. Emerson grantors and the said Mary L. Manson grantee being brothers and sisters of Annie T. McGeary and being her only heirs-at-law and next of kin." It was recorded on April 22, 1905. Martin McGeary died in 1910.

In 1923 appellant received an offer for the property, and when the title was examined the point was made that there had been no quit-claim from Michael McGeary. Appellant went to New York and endeavored to secure a quit-claim deed from Edward J. McGarry, the original complainant herein, but did not secure it. That same year appellant visited the complainant Jane Simpson and asked her to execute a quit-claim deed, which she did. While appellant insists that the deeds thus executed in her favor are valid, she also relies upon the rule that adverse possession of land for twenty years will bar an owner from recovery, and upon the statutory provision to the effect that every person in the actual possession of lands or tenements for seven successive years under claim and color of title made in good faith, who during such time pays all taxes assessed thereon, shall be held to be the legal owner of such lands to the extent and according to the purport of the paper title. She further contends that the claims of appellees are barred by *laches*. Appellees contend that the

deeds cannot be upheld because a fiduciary relation existed between appellant and the grantors, and appellant has not sustained the burden of proving that the transactions through which they were obtained were fair.

As to the claim of adverse possession, appellees argue that appellant was a co-tenant and a trustee of the property, and assert that as such she could not acquire adverse rights therein under the theories invoked. The rule is well settled that the mere possession by one tenant in common who receives all the rents and profits and pays the taxes assessed against the property, no matter for how long a period, cannot be set up as a bar against the co-tenants. In such case the possession of one tenant in common is in contemplation of law the possession of all the tenants in common. Such possession, however, may become adverse if the tenant in common by his acts and conduct disseizes his co-tenants by repudiating their title and claiming adversely to them. (*Long v. Morrison,* 251 Ill. 143; *Steele v. Steele,* 220 id. 318.) Before the possession of one tenant in common can be adverse to the co-tenant there must be a disseizin or ouster by some outward act of ownership of an unequivocal character, overt and notorious, and of such nature as to impart information and notice to the co-tenant that an adverse possession and disseizin are intended to be asserted by the tenant in possession. (*Andrews v. Floyd,* 308 Ill. 559.) Such notice need not, however, be formal in its nature, (*Roberts v. Cox,* 259 Ill. 232,) and if one tenant in common holds exclusive possession, claiming the land as his, and his conduct and possession are of such a character as to give notice to his co-tenant that his possession is adverse, the Statute of Limitations will run. (*Tillotson v. Foster,* 310 Ill. 52; *Hahn v. Keith,* 170 Wis. 524, 174 N. W. 551.) It is a rule of evidence, merely, which enters into the question whether the possession is in fact adverse, and not a rule of law which forbids the application of the Statute of Limitations to persons who

occupy to each other the relation of tenants in common. *Foulke* v. *Bond,* 41 N. J. L. 527.

If the present record disclosed nothing more than continued possession of the property by appellant, coupled with receiving the rents and profits and payment of taxes, there would not be sufficient basis for concluding that she acquired title under any theory of adverse possession. But the argument that she acquired no rights because she never disseized appellees by any unequivocal act overlooks entirely the events of 1904 and 1905. As already indicated, some three years after the mother's death a lawyer retained by appellant wrote a letter to her brother, Martin, requesting an interview regarding the property. Conferences with reference to a conveyance by Martin and Elizabeth to appellant followed. Martin and Elizabeth were informed by appellant's lawyer that the requested conveyance by them to appellant would wipe out all their interests, not only as remaindermen under the will of Annie T. McGeary but as heirs of their brother, Michael. Appellant said in Elizabeth's presence that the property was heavily encumbered and not more than good security for the indebtedness or what had been paid out in handling it, claimed that she had spent more money than the property would represent, asserted that foreclosure was impending, and told Elizabeth that she wanted a quit-claim deed in order to become the owner of it. Some six months after the writing of the letter introduced by appellees, and after the conferences which were had regarding the matter, the deed was executed in the lawyer's office. By its terms it conveyed all title to the property. Few acts would point more conclusively toward open and unequivocal repudiation of the joint title and interests of brothers and sisters than to retain a lawyer to broach the subject and in his office to demand and obtain from them a quit-claim deed. *Roberts* v. *Cox, supra; Winters* v. *Haines,* 84 Ill. 585; *Peeples* v. *Boykin,* 132 Miss. 359, 96 So. 177.

After the deed was delivered it was placed on record. It constituted good color of title. (*Waterman Hall* v. *Waterman,* 220 Ill. 569; *Tillotson* v. *Foster, supra.*) Appellant continued in possession of the property, collected the rents and paid all taxes and expenses. The possession of one claiming the exclusive ownership of land is adverse to all the world and not merely adverse to those who know or claim that they have some title to the property. A person's possession of land is notice to all the world of his claim to possession of the same, and if another person does not learn of his claim to possession until the bar of the Statute of Limitations has attached it will be his own neglect and inattention, from which he can claim no immunity. (*Waterman Hall* v. *Waterman, supra.*) As to the element of good faith, there is good faith where there is no fraud and the color of title is not acquired in bad faith. Good faith in the acquirement of title, within the meaning of the statute, does not require ignorance of adverse claims or defects in the title. Notice, actual or constructive, is of no consequence. There may be good faith notwithstanding actual notice of existing claims or liens, or knowledge of legal defects which prevent the title, of which there is color, from being absolute, (*Keppel* v. *Dreier,* 187 Ill. 298; *Gage* v. *Chicago Title and Trust Co.* 303 id. 569;) and to overcome the presumption that color of title under the seven-year Statute of Limitations was acquired in good faith the evidence must show an intent to deceive, mislead or defraud. The evidence in this record does not show such an intention. Under the provisions of the statute (Cahill's Stat. 1929, chap. 83, par. 6,) appellant became the owner of the property. *Winters* v. *Haines, supra; Hughes* v. *Hall,* 284 Ill. 628; *Baldwin* v. *Ratcliff,* 125 id. 376; *Peabody* v. *Burri,* 255 id. 592; *Tillotson* v. *Foster, supra; Kotz* v. *Belz,* 178 Ill. 434.

Appellees contend, nevertheless, that the Statute of Limitations could not start to run against them because appel-

lant was in possession of the property as a trustee under the will, subject to duties and obligations arising out of that office by reason of her failure to account. This contention is not tenable. Even though the relation of trustee and *cestui que trust* exists, the trustee may repudiate the relation and claim to hold in his own right, in which case the Statute of Limitations will begin to run in his favor as if between strangers. (Tiffany on Real Prop. (2 volume-in-one ed.) sec. 443; *Benedict* v. *City of New York*, 250 U. S. 321; *Wooley* v. *Stewart*, 222 N. Y. 347, 118 N. E. 847; *Amory* v. *Trustees of Amherst College*, 229 Mass. 374, 118 N. E. 933.) In *Zeller's Lessee* v. *Eckert*, 4 How. 289, the court said: "The trustee may disavow and disclaim his trust; the tenant, the title of his landlord after the expiration of his lease; the vendee, the title of his vendor after breach of the contract; and the tenant in common, the title of his co-tenant, and drive the respective owners and claimants to their action within the period of the Statute of Limitations. The only distinction between this class of cases and those in which no privity between the parties existed when the possession commenced is in the degree of proof required to establish the adverse character of the possession." Story said (3 Story's Eq. Jur.—14th ed.—sec. 1973) : "It is often suggested that lapse of time constitutes no bar in cases of trust. But this proposition must be received with its appropriate qualifications. As long as the relation of trustee and *cestui que trust* is acknowledged to exist between the parties and the trust is continued, lapse of time can constitute no bar to an account or other proper relief for the *cestui que trust*. But where this relation is no longer admitted to exist, or time and long acquiescence have obscured the nature and character of the trust or the acts of the parties, or other circumstances give rise to presumptions unfavorable to its continuance, in all such cases a court of equity will refuse relief upon the ground of lapse of time and its inability to do complete

justice. This doctrine will apply even to cases of express trust." Approval of this principle was voiced by this court in *Benson* v. *Dempster,* 183 Ill. 297, where we also quoted the following from *Hammond* v. *Hopkins,* 143 U. S. 224: "The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transaction having become so obscured by time as to render the ascertainment of the exact facts impossible." (See, also, *Neagle* v. *McMullen,* 334 Ill. 168; *Carlock* v. *Carlock,* 249 id. 330; *Dempster* v. *Rosehill Cemetery Co.* 206 id. 261; *Amory* v. *Trustees of Amherst College, supra.*) Speaking with reference to this rule the court said in *Starkey* v. *Fox,* 52 N. J. Eq. 758, 29 Atl. 211: "It will be noted that this doctrine is not an exception to the rule but proceeds on an inference from facts other than, but in connection with, the lapse of time, that the trust has been executed or in some way extinguished. As is said by the Master of the Rolls in *Pickering* v. *Stamford,* 2 Ves. Jr. 581: 'Every presumption that can fairly be made shall be made against a stale demand. It may arise from the acts of the parties, or the very forbearance to make the demand affords a presumption either that the claimant is conscious it was satisfied or intended to relinquish it.' "

The rule has been laid down by convincing authority that in cases of trusts which are or have become passive, so that the *cestui* is entitled to call for a transfer of the title and possession, allowing the trustee to remain in possession for a long period of time without any active recognition of the interest of the *cestui* may be so inconsistent with a claim of an equitable interest and a recognition thereof by the trustee during that time that the *cestui's* claim will be barred by his long unexplained delay, even though he has no other notice or a repudiation by the trustee. (2 Perry on Trusts and Trustees—7th ed.—sec. 864a.)

*Laches* is not excused by simply saying, "I did not know." If by diligence a fact can be ascertained, the want of knowledge so caused is no excuse for a stale claim. The test is not what the plaintiff knows, but what he might have known by the use of the means of information within his reach with the vigilance the law requires of him. (*Taylor* v. *Coggins,* 244 Pa. 228, 90 Atl. 633; *Blaul* v. *Dalton,* 264 Ill. 193; *Neagle* v. *McMullen, supra.*) Speaking on the point of the length of time within which parties must assert their rights in equity this court has said: "Parties will be required to assert their rights within a shorter time in States where the values of real estate increase rapidly and greater temptations are thereby afforded for speculative litigation." *Elmore* v. *Johnson,* 143 Ill. 513; *Carlock* v. *Carlock, supra.*

Under appellees' theory, upon the death of Ann Mc-Geary, in 1901, her sons and daughters named in the will as residuary legatees became entitled, as *cestuis que trustent,* to undivided portions of the estate. Appellant was in possession and was trustee. Some twenty-three years went by. Appellees then took action to enforce their alleged rights, praying, among other things, accounting for transactions extending back more than thirty years. However, it is unnecessary to dismiss, by reference solely to any theory based fundamentally on the mere *laches* of appellees, their claim that as *cestuis que trustent* they have equities which cannot be defeated here. By the emphatic method of demanding a quit-claim deed to all the property and placing it on public record, in the manner and under the circumstances hereinabove described, appellant openly repudiated any obligation toward them. Even after this, nearly twenty years went by before appellees made a move. Granting that there was at the outset a relationship of trustee and *cestuis que trustent* it cannot be held to have affected the operation of the Statute of Limitations from the time that its obligations were repudiated.

The decree of the superior court is reversed and the cause is remanded, with directions to dismiss the bills and to enter a decree granting the relief prayed by appellant's cross-bill.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded, with directions.*