5 Ill. App.2d 261 (1955)
125 N.E.2d 654
People of State of Illinois ex rel. James J. Brady, Auditor of Public Accounts, Plaintiff Below,
v.
La Salle Street Trust & Savings Bank et al., Defendants Below. Joseph J. Duffy, Administrator of Estate of William Lorimer, Deceased, etc. et al., Intervening Petitioners Below, Appellants,
v.
Chicago Title and Trust Company, Respondent Below, Appellee.
Gen. No. 46,126.
Illinois Appellate Court  First District, Second Division.
March 8, 1955.
Rehearing denied March 28, 1955.
Released for publication April 20, 1955.
*262 *263 *264 *265 Rothbart & Rosenfield, and Francis M. Lowes, all of Chicago, for petitioners and objectors-appellants; Edward Rothbart, J.M. Rosenfield, Francis M. Lowes, Joseph Stein, and Thomas E. Moran, all of Chicago, of counsel.
Charles F. Grimes, and Kirkland, Fleming, Green, Martin & Ellis, all of Chicago, for respondent-appellee; *266 Joseph B. Fleming, Thomas M. Thomas, Elmer M. Leesman, and William M. Rice, all of Chicago, of counsel.
MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.
A decree was rendered in the circuit court of Cook county on an amended intervening petition filed by William Lorimer and others on January 12, 1932. The suit in which the intervening petition was filed was started June 18, 1914 to wind up the affairs of the La Salle Street Trust and Savings Bank, an Illinois corporation. Certain objections had been filed to various reports and accounts submitted by the Chicago Title and Trust Company, successor receiver of the La Salle Street Trust and Savings Bank, which accounts were filed on March 16, 1932, April 18, 1940 and on April 21, 1943, and these objections were substantially the same as those alleged in the petition. These objections were included in the order of referral to the master and were considered in the hearing. The trial court entered a decree dismissing the amended intervening petition for want of equity, approving and confirming all the accounts theretofore filed by the Chicago Title and Trust Company as receiver of the La Salle Street Trust and Savings Bank, and overruling all objections thereto. The decree further provided that the respondent, Chicago Title and Trust Company, be released and discharged from all further duties and liabilities on account of the said receivership. From this decree appeal is taken on the theory that the intervening petition and the objections to the accounts and reports were to recover assets of a receivership estate which allegedly wrongfully came into the possession of the respondent and were not accounted for by it, and to recover the legal profits which the respondent received while acting in a fiduciary capacity towards the receivership estate, together with interest thereon; that the master and the chancellor incorrectly interpreted *267 the law applicable, and that under a proper application of the law the facts established were sufficient to sustain the petition.
The abstract filed in this case consists of 323 printed pages. An additional abstract was filed consisting of 244 pages. The record contains 7,321 pages. The essential facts contained in this voluminous record are as follows: The La Salle Street National Bank was organized on or about May 9, 1910, and carried on a general banking business in Chicago from that time until about October 21, 1912, when it ceased doing business. On October 19, 1912 the La Salle Street Trust and Savings Bank, an Illinois corporation, was organized and succeeded the National Bank. During the entire time, William Lorimer was president, Charles B. Munday vice-president, and they, together with Harry W. Huttig, were members of the board of directors, both of the National and State Banks.
The Rosehill Cemetery Company is a corporation organized under a special act of the General Assembly of the State of Illinois approved February 11, 1859. The capital stock of the cemetery company, as fixed by its charter, was $500,000, divided into 5,000 shares of the par value of $100 each. The Rosehill Cemetery Company acquired about 325 acres of land in the Town of Lake View in Chicago, which it used and is using for cemetery purposes, together with other property incidental thereto.
The Rosehill Cemetery Company, when it sold burial lots, had for many years collected an additional sum over and above the selling price of the lots, which money it agreed to hold in trust forever as a Perpetual Care Fund. By the spring of 1912 that fund had reached substantial proportions and was invested in numerous high-grade securities.
In 1912 Rosehill had 5,000 shares outstanding. Of these, 2.668 1/3 were owned by the three heirs of Killian Lansingh (Grace Wiles, Van Rennsalaer Lansingh and *268 Blanche Freeman), and 447 1/2 were owned by Pettibone, Osborne and Minor. The remaining shares of the 5,000 were owned by Wesley Dempster, A.W. Vercoe and others, hereafter referred to as the Dempsters.
On May 20, 1912, by a contract dated April 1, 1912, Munday and Huttig, associated with Joseph Morris, Frederick Reynolds and Jess Briegel, contracted to purchase from Pettibone, Osborne and Minor 447 1/2 shares of Rosehill stock for $300 per share, and on May 20, 1912, by a further contract (hereafter referred to as the Lansingh contract), which was dated April 1, 1912, Munday and Huttig and their associates agreed to buy 2,668 1/3 shares of Rosehill stock from Lansingh, Wiles and Freeman at an agreed price of $325 a share, or a total of $867,208.33, payable over a period of ten years. The buyers made a downpayment in cash of $96,208.33 and agreed to pay the remaining balance of $771,000 in installments, $20,000 to be paid on October 1, 1912, $25,000 semiannually during the years of 1913, 1914, 1915 and 1916, and $50,000 semiannually during the years of 1917, 1918, 1919, 1920 and 1921, with a final payment of $51,000 in 1922, with interest at 5 per cent per annum on the deferred payments.
Under the terms of the contract the Chicago Title and Trust Company, as trustee, held possession of the stock until the purchase price was fully paid, but the buyers could withdraw up to 167 shares as they made the payments. This would at all times leave 2,501 1/3 shares, or a majority of all the Rosehill shares, in the hands of the trustee, which shares, however, could be voted by the buyers on proxies issued by the trustee. The contract further provided that in the case of default in the payment of the principal or interest, or in the performance of any of the covenants, the trustee, on the written request of the sellers, could declare the full amount of all the notes then outstanding to be immediately due and payable.
*269 By the purchase of the said stock Munday and his associates secured control of Rosehill Cemetery Company, and they shortly after April 1, 1912 formed a new corporation known as Cemetery Securities Company. Under the Lansingh contract Munday and his associates were entitled to withdraw one share from the trust for every $325 paid in excess of the sum of $150,000. On April 1, 1914, under the terms of the contract, they had paid $191,208.33 and therefore were entitled to, and did receive, shares representing the difference between that sum and $150,000, or 126 shares. They assigned the 447 1/2 shares purchased from Pettibone, Osborne and Minor, together with their rights to the 2,668 1/3 shares purchased under the Lansingh contract, of which 126 shares had actually been delivered to them, to the Cemetery Securities Company in payment for the stock in that corporation. The Cemetery Securities Company therefore held 573 1/2 shares of Rosehill company stock, with the right to secure the balance of the stock sold under the Lansingh contract.
The Cemetery Securities Company then made loans from the La Salle Street Trust and Savings Bank (hereafter called the State Bank), which at the time of the closing of the bank amounted to the sum of $106,000, evidenced by its note and secured by 352 1/2 shares of Rosehill stock. From April 1912 to 1914, Munday and his associates, while in control of the Cemetery Securities Company and the Rosehill Cemetery Company, transferred 219 shares of Rosehill stock, along with certain worthless securities, to the Rosehill Cemetery Company, and received in return therefor good securities out of the Perpetual Care Fund of the Rosehill company, and certain cash which was paid to Munday and Huttig. The remaining two shares of Rosehill stock held by the Cemetery Securities Company were transferred to one Thomas Wallis.
*270 On May 22, 1914, a minority stockholders' suit was filed by Wesley Dempster, on behalf of the stockholders of Rosehill, in the superior court of Cook county, case no. 308793, against the State Bank and against Munday and his associates, charging the wrongful depletion of the Rosehill Perpetual Care Fund and the wrongful using of such money to make payments for the Rosehill shares purchased by Munday and his associates from Pettibone, Osborne and Minor, and from the Lansinghs, and praying for an accounting and return of the money and securities taken from the Perpetual Care Fund. As a result of this suit the auditor of the State of Illinois closed the State Bank on June 12, 1914, and on June 18, 1914 filed this suit, being circuit court no. B-3379. On June 19, 1914 William C. Niblack was appointed receiver of the State Bank, and a creditors' committee was formed on behalf of the creditors. At the time of his appointment as receiver for the State Bank and down to the time of his death on May 6, 1920, Niblack held the office of vice-president, director and trust officer of Chicago Title and Trust Company, the respondent herein.
At the time the State Bank went into receivership it held 352 1/2 shares of Rosehill stock, as collateral for notes of the Cemetery Securities Company, and Thomas Wallis held two shares to qualify as one of the directors of the Rosehill company. The balance of 2,542 1/3 shares left after the withdrawal by Munday and his associates of 126 shares from the original 2,668 1/3 shares sold under the Lansingh contract was held by Chicago Title and Trust Company, as trustee of that contract.
In the afore-mentioned case filed by Wesley Dempster on behalf of the stockholders of Rosehill, Niblack, as receiver of the State Bank, was made a party defendant, and the Chicago Title and Trust Company was appointed receiver of Rosehill Cemetery Company on November 25, 1914, and among other assets succeeded *271 to the 219 shares of Rosehill stock held by Rosehill as security for the note of Cemetery Securities Company, and also became custodian, as such receiver, of the Perpetual Care Fund.
On December 28, 1914, Niblack, as receiver of the State Bank, filed suit in the circuit court of Cook county, being case no. 7504, against Munday, Huttig and others, claiming that as receiver he was then the beneficial owner of the shares of Rosehill stock procured by Munday and Huttig and the beneficial owner of the Lansingh contract, and claiming further that the payments made by Munday and his associates under that contract had been financed by money obtained by pretended loans from the National and State Banks, and that for that reason there was a resulting trust in favor of the National Bank, to which the State Bank succeeded, as assignee. He prayed that he might be declared the beneficial owner of the Lansingh contract, subject to the rights of Rosehill and others, and subject further to the payments required to be made to the said Van Rennsalaer Lansingh, Grace R. Wiles and Blanche L. Freeman under and in pursuance of the collateral trust agreements. To effectuate this claim it was necessary that Niblack keep up the payments under the contract. With that in view, Niblack in January of 1915, after notice to all the interested parties, including attorneys Rice, Lowes & O'Neil (Lowes being one of the attorneys for the intervening petitioners in this cause), filed a petition in the circuit court, before Judge Windes, in which he set forth his claim that the State Bank was the beneficial owner of the Lansingh contract, stating that he was uncertain as to the value of the Rosehill stock sold under that contract, and that he was uncertain as to the advisability of the use of the funds in his hands as receiver in purchasing said stock. Judge Windes, on January 30, 1915, entered an order finding that it would not be advisable for the receiver to use any such monies in his hands as such receiver *272 for the purpose of making payments under the Lansingh contract. No further proceedings were taken in Niblack's suit against Munday, and on February 25, 1918 the same was dismissed by stipulation.
Niblack, as receiver, also filed a claim in the Munday bankrupt estate in the District Court of the United States on behalf of the State Bank in the sum of $461,001.24, and on March 27, 1915 filed a petition in the circuit court of Cook county in the instant case asking for authority, as receiver, to execute an acceptance of an offer of composition made by Charles B. Munday and J. Guy Munday, individually and as copartners under the firm name of C.B. Munday & Company, all of whom, both firm and individuals, had been adjudicated bankrupt. Judge Windes found that it was to the best interests of the creditors and stockholders of the State Bank that the proposed composition be accepted by the receiver, and thereupon ordered the receiver to execute an acceptance of the same.
The Dempsters, on November 15, 1915, secured a loan from the Chicago Title and Trust Company in the sum of $950,000. On November 17, 1915, Niblack, in this case, petitioned the court for leave to sell the 352 1/2 shares of Rosehill stock held by him as receiver, to Edwin M. Ashcraft, who was attorney for the Dempster group, representing to the court that a fair price per share of said stock was $300. Pursuant to an order granting leave to sell, Niblack sold the shares for $105,750, or approximately $300 per share. The Dempster group then abandoned its claim against the State Bank based on the alleged participation of the State Bank in the wrongful handling of the securities taken out of the Perpetual Care Fund of the cemetery company, a liability which it was represented to the court by the attorney for the receiver might amount to upwards of $100,000.
On November 30, 1915, a decree was entered in the minority stockholders' suit, pursuant to the terms of *273 which the Dempster group paid in cash to the Chicago Title and Trust Company, as receiver of Rosehill, the sum of $65,700, or $300 per share, and received 219 shares of Rosehill stock and the note of the Cemetery Securities Company, secured by such shares theretofore held by Rosehill. Provision was also made by the decree for the rehabilitation of the Perpetual Care Fund, and the Dempsters agreed to purchase from the fund, at their par and face value of $131,575.86, some of the doubtful or worthless securities placed in the fund by Munday and his associates. The decree provided that said purchase price should be paid by having Rosehill pay one-half of all dividends on all of its stock to the Chicago Title and Trust Company, as custodian of the Perpetual Care Fund, until the full amount had been paid.
In the meantime, the payments due the sellers under the Lansingh contract in December 1914 had been paid by one William S. Freeman, assignee of the Lansingh contract from Munday, Huttig et al., and Cemetery Securities Company and Freeman also subsequently paid principal and overdue interest to keep the contract alive until October 25, 1915. Freeman assigned his interest in the Lansingh contract, thus obtained, to the Dempster group, who also acquired the two shares owned by Thomas Wallis, for the sum of $715, which was the highest price paid by anyone interested in the Rosehill shares. The balance due the sellers under the Lansingh contract was paid off in full. The Dempster group thereupon wound up owning all the stock in the Rosehill Cemetery Company but owing the Chicago Title and Trust Company the sum of $950,000 on their loan. As security for such loan, the Dempster group deposited with the Chicago Title and Trust Company 4,500 shares of the Rosehill cemetery stock.
Niblack died on May 6, 1920, and on May 10, 1920 the Chicago Title and Trust Company was appointed successor receiver of the State Bank in his stead. A final *274 report and account of Niblack's actions as receiver was filed by his executors. On December 15, 1920 an order was entered by the court which, after reciting that it had examined Niblack's final report and account and that the same had been examined and approved by the creditors' committee of the State Bank, approved the final report and account and discharged the estate of Niblack and the sureties on his bond.
On November 21, 1924 Chicago Title and Trust Company filed its final report as receiver for the State Bank. No asset or claim in connection with the Lansingh contract was listed therein. An order was entered by the court, on that day, requiring that all objections to such final report be filed with the court on or before December 2, 1924, and further requiring the publication of notice of the filing of said report and of the right to file objections to it by the time specified, and also that a copy of the order be given to the chairman of the creditors' committee. Notification was required to be given to the creditors' committee of any such objections. No objections were made to the final report and on December 17, 1924 the final report was approved by an order which, after reciting that the said notices had been given, provided that upon distribution of the balance of the funds then in its hands, pro rata to the creditors, and after deduction of certain fees, the receiver should be discharged, except that the receivership was to continue for the purpose of prosecuting certain litigation against the O'Gara Coal Company.
On January 12, 1932 leave was granted William Lorimer to file his intervening petition in this proceeding On the death of Lorimer, the joint and several petition of William Lorimer, Jr., administrator of the estate of William Lorimer, deceased, and Thomas McDonald, as stockholders of the La Salle Street Trust and Savings Bank, and Louis H. Pink, Superintendent of Insurance *275 of the State of New York, as liquidator of the National Surety Company, and the Maryland Casualty Company, and the Massachusetts Bonding and Insurance Company, individually and as assignee of the Aetna Casualty Company, creditors of the State Bank, was filed on August 9, 1940. The petition is quite voluminous and consists of various allegations of fact and propositions of law. The essential core of the petitioners' complaint is that Munday and his associates wrongfully obtained money from the National Bank and the State Bank while in control of those banks, and contracted to purchase 3,115 5/6 shares of Rosehill Cemetery Company stock; that the State Bank, in its own right, and as assignee of the National Bank, thereby was entitled to have a trust declared in said stock, and that any subsequent takers of the stock took with notice of the bank's rights; that Niblack, as receiver for the State Bank, was an officer and director of the Chicago Title and Trust Company; that he received a salary from the Chicago Title and Trust company and turned in his receivership fees to the company, and that he was, in effect, an employee of the Chicago Title and Trust Company; that upon the death of Niblack, the Chicago Title and Trust Company became receiver for the State Bank, and used the monies which came to its hands as receiver in its own business, and also used the money which Niblack acquired as receiver, in its business; that the various sales of Rosehill shares, made by Niblack as receiver for the State Bank, and by the Chicago Title and Trust Company as receiver for Rosehill Cemetery Company, were made for a price much less than the value of the shares which, on November 15, 1915, it was alleged was $2,000 each; that the dividends from the shares sold under the Lansingh contract would have been sufficient to pay the remaining installments of principal and interest due thereunder, and that the Dempster group and the Chicago *276 Title and Trust Company should be decreed to hold in trust for the State Bank the shares sold under the Lansingh contract. The petition then prayed that an accounting be had of all dividends received on said 3,115 5/6 shares after November 15, 1915; that the State Bank be declared the beneficial owner of all 3,115 5/6 shares; and that the Chicago Title and Trust Company be removed as receiver for the State Bank.
An answer was filed by the respondent, Chicago Title and Trust Company, contesting the intervening petition and raising the defenses of laches and the running of the statute of limitations.
The basic issues raised by the intervening petition and the answer thereto are whether Munday and his associates on or about April 1, 1912, while directors and officers of the National Bank and while acting in a fiduciary capacity, wrongfully received money from that bank in the form of a loan and used such money for the purchase of 447 1/2 shares of Rosehill stock from Pettibone, Osborne and Minor for the sum of $134,250, and for the purchase of 2,668 1/3 shares of Rosehill stock under the Lansingh contract, whereby the National Bank assertedly became entitled to have a trust declared in its favor in said shares, to which right the State Bank succeeded; and whether Niblack, as receiver for the State Bank, in concert with the Chicago Title and Trust Company, perpetrated a fraud on the State Bank, its shareholders and creditors in that Niblack was merely an employee of the Chicago Title and Trust Company while acting as receiver for the State Bank, and the Chicago Title and Trust Company was in fact the receiver, and the sale of Rosehill stock by Niblack as receiver for the State Bank was made for a price much less than the value of the shares.
On April 21, 1943 the Chicago Title and Trust Company, receiver, presented a written tender of resignation to the court in this case, and on that day an order *277 was entered that the tender of resignation be filed and the resignation accepted. On April 26, 1943 the attorney general appeared in that court, representing the auditor of public accounts, and reported to the court that the auditor had appointed Joseph J. Miller and Martin Gerber as coreceivers to succeed Chicago Title and Trust Company as receiver, and on that date the court entered an order approving and confirming the said appointments. On June 7, 1943 an order was entered in this case providing that the afore-mentioned petitioners may "continue to prosecute and pursue all cause or causes of action and claims of La Salle Street Trust and Savings Bank or its creditors and stockholders and Martin Gerber and Joseph J. Miller, Receivers herein, to recover assets of the La Salle Street Trust and Savings Bank for the benefit of such receivership estate and the stockholders and creditors of the said La Salle Street Trust and Savings Bank, and all causes of action and claims against Chicago Title and Trust Company, former receiver herein, and others, and in said connection the said afore-mentioned stockholders and creditors of La Salle Street Trust and Savings Bank are hereby authorized to proceed either in their own names or in the names of Martin Gerber and Joseph J. Miller, receivers herein, or in both their own names and the names of said receivers jointly, for and on behalf of this receivership estate."
On June 23, 1943 the intervening petition was amended making Martin Gerber and Joseph J. Miller, receivers of the State Bank, additional parties to the intervening petition.
On March 16, 1932, April 18, 1940 and on April 21, 1943 the Chicago Title and Trust Company, as receiver of the State Bank, by order of court filed reports. To these reports the petitioners filed objections containing substantially the same allegations as made in the instant petition.
*278 In order for the petitioners to succeed, the court must reach the following conclusions: First: That the Chicago Title and Trust Company, receiver of the Rosehill Cemetery Company, because of its close relationship with Niblack, receiver of the State Bank, and because of the methods used by Niblack in carrying out the receivership, became a fiduciary as far as the creditors of the State Bank were concerned and improperly dealt with the receivership estate to its own profit, or that the transfer of the stock of the Rosehill Cemetery Company by Niblack, as receiver, to the Dempster interests, which sale and transfer were approved by the court November 19, 1915, was fraudulent in that Niblack, as receiver, transferred the said stock in derogation of the alleged rights of the creditors of the State Bank at an inadequate price, and to the profit of the respondent. Second: That at the time of the original transaction with the La Salle Street National Bank the stock of the Rosehill Cemetery Company under the Lansingh contract was secured by improper and wrongful manipulation of the bank's funds and not by legitimate loans from the bank by the purchasers properly made under the then law. Third: That the orders of court heretofore entered in this case are not a bar to any relief now sought by the petitioners. Fourth: That the rights of the parties to the instant action have not been barred by the statute of limitations or by laches.
[1] In this case the report of the master was approved by the trial court. The court, with its decree, filed a well-considered opinion which has been very helpful to us. It is well established as law that where the findings of the master have been confirmed by the court, such findings will not be disturbed unless manifestly against the weight of the evidence. Wurth v. Hosmann, 410 Ill. 567; Zeta Bldg. Corp. v. Garst, 408 Ill. 519; Schmalzer v. Jamnik, 407 Ill. 236; Chambers v. Appel, 392 Ill. 294; Miller v. Rich, 147 Ill. App. 65.
*279 [2-6] Petitioners urge that the trial court and the master applied an improper theory of law in the case in that, as petitioners contend, the rule is that a fiduciary relationship having been established, the burden of proof rests upon the respondent to show that all of its acts were fair and proper with respect to its fiduciary. The rule is stated in Bremer v. Bremer, 411 Ill. 454, as follows:
"Constructive trusts are divided into two classes; one where actual fraud is considered as equitable ground for raising the trust, and the other consisting of those cases in which the existence of a fiduciary relation and the subsequent abuse of the confidence reposed is sufficient to establish the trust. (Suchy v. Hajicek, 364 Ill. 502; Catherwood v. Morris, 345 Ill. 617; Neagle v. McMullen, 334 Ill. 168.) A standard example of a constructive trust is where property is conveyed to a grantee upon his parol promise to convey to a third person, or for the use and benefit of other persons. (Brooks v. Gretz, 313 Ill. 290.) In the first type referred to the burden is upon the one seeking to establish the constructive trust to prove that the claim is of such character as to raise the trust. (Delfosse v. Delfosse, 287 Ill. 251.) Where the existence of a fiduciary relationship has been established, the law presumes that any transactions between the parties, by which the dominant party has profited, is fraudulent. This presumption is not conclusive, but may be rebutted by clear and convincing proof that the dominant party has exercised good faith and has not betrayed the confidence reposed in him. The burden rests upon the dominant party to produce such evidence, and if the burden is not discharged the transaction will be set aside in equity. (Clark v. Clark, 398 Ill. 592; McCord v. Roberts, 334 Ill. 233.)"
[7] The fiduciary relationship which the petitioners seek to establish is a fiduciary relationship between *280 the respondent and the creditors of the State Bank. In order to establish such a relationship the petitioners must prove to the satisfaction of the court that Niblack during the time when he was receiver of the State Bank was acting merely as an agent of the respondent and the respondent in fact was the receiver. The burden of proof here is on the petitioners. In Johnson v. Lane, 369 Ill. 135, the court says:
"Where it is sought to establish a fiduciary relation by parol evidence, the proof must be clear, convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion. (Neagle v. McMullen, 334 Ill. 168; Winkelman v. Winkelman, 307 Ill. 249; Pillsbury v. Bruns, 301 Ill. 578.) Relief against a fiduciary relationship is predicated upon the doctrine of constructive trust and is awarded on the theory that the defendant holds title as trustee for the grantor. To establish that relationship and constructive trust, the proof must be clear and convincing. (Hogg v. Eckhardt, 343 Ill. 246; Fish v. Teninga, 330 Ill. 160; Rubin v. Midlinsky, 321 Ill. 436.)"
See also Finney v. White, 389 Ill. 374.
[8] Petitioners contend that the facts that the respondent kept the books for the receiver, that the funds of the receivership were deposited in the bank accounts of the respondent, that Niblack was vice-president, director and chief trust officer of respondent, and that he turned over to the respondent a sum equivalent to the amount he received as receiver, establish their assertion. However, it appears from the record that Niblack turned over none of his fees to the Chicago Title and Trust Company prior to the beginning of the year 1916, at which time the entire stock of Rosehill had been acquired by the Dempster group. In the record there is also evidence that Niblack acted without any control of the respondent. A suit was filed by Niblack in which the respondent, as receiver of Rosehill, *281 was the defendant. There is no evidence that at any time Niblack acted otherwise than on his own initiative and in reliance on his own judgment. Whatever mechanical operations with reference to the receivership were performed by the respondent were performed under the control and direction of Niblack. We are not passing on the propriety of Niblack's acting as a receiver while an officer of the Chicago Title and Trust Company under the circumstances appearing from this record. Nevertheless, the finding that Niblack's relationship to the respondent did not make the respondent a fiduciary is substantiated by the evidence. It was so found by the master and his report was confirmed by the trial court. It is said in the opinion filed by the trial court: "Niblack was the Receiver of the State Bank, both in fact and in law, and while he used the facilities of the Chicago Title and Trust Company in the conduct of the receivership, that was for convenience only, and there is no evidence that the Chicago Title and Trust Company influenced his conduct in any way whatsoever. In every step which he took as receiver, the Court was apprised of his activity and passed upon his conduct." This also was the finding of the master approved by the trial court. We feel that this finding is fully sustained by the evidence.
Having failed to prove a fiduciary relationship, it then devolves upon the petitioners to prove actual fraud upon the part of Niblack in order to raise a constructive trust, and to prove that fraud by clear and convincing evidence. Finney v. White, 389 Ill. 374; Sirois v. Sirois, 308 Ill. 453. The theory of the petitioners is that fraud occurred in the entry of the orders of January 30, 1915 and November 19, 1915.
[9, 10] Under the Lansingh contract of April 1, 1912, between Munday and his associates and the Lansinghs, unless certain installment payments were made at stated times the contract was in default. Unless Niblack, as receiver of the State Bank, made those payments, *282 whatever rights he sought in the bill filed by him against Munday to impose a constructive trust in favor of the creditors of the State Bank would be of no value. Niblack had, on December 28, 1914, as receiver, filed a suit against Munday and his associates claiming to be the beneficial owner of the 3,115 5/6 shares purchased by them, which included the subject matter of the Lansingh contract. In that suit he prayed that a constructive trust be imposed upon the said shares, subject to payments required to be made to the Lansinghs and subject to the prior rights of Rosehill and others. In January 1915, Niblack, after proper notice given, filed his petition in the circuit court asking advice as to whether he should use the funds in his hands as receiver in purchasing the stock. Judge Windes on January 30, 1915 entered an order finding that it would not be advisable for the receiver to use receivership money to make payments under the Lansingh contract. We believe the court could not rule otherwise. It is the duty of a receiver to liquidate the funds of the bank and not to manage (McIlvaine v. City Nat. Bank & Trust Co., 314 Ill. App. 496), and it is certainly not his duty to enter into speculation with the receivership funds. Niblack then abandoned the suit previously filed by him in which he had taken a position analogous to the position of the petitioners in the instant case. The suit was only abandoned by Niblack when it became apparent that under the order of Judge Windes it would be impossible for him to reap any benefits for the creditors even if the suit had been determined in his favor.
Subsequently, on November 17, 1915, Niblack as receiver petitioned the court for leave to sell the 352 1/2 shares of Rosehill stock held by him as receiver to Edwin M. Ashcraft, who was attorney for the Dempster group, representing to the court that a fair price per share for the said stock was $300 a share. Proper *283 notice was given, and an order was entered by the court granting leave to sell, and the shares were sold at approximately $300 a share. The Dempsters, on November 15, 1915, had secured a loan from the Chicago Title and Trust Company in the sum of $950,000. By a decree entered November 30, 1915 in the Rosehill minority stockholders' suit, which recited that the Dempsters owned all the Rosehill stock, provision was made that the Dempsters rehabilitate the Perpetual Care Fund of the Rosehill cemetery by purchasing from the fund the doubtful or worthless securities which had been placed in the fund by Munday and his associates, at their par value, or the sum of $131,575.86.
The petitioners contend that the Rosehill shares on November 15, 1915 were worth a sum greatly in excess of $300 a share, that they were worth at least $2,000 a share, and that the valuation of the Rosehill assets on November 15, 1915 was approximately $11,500,000. They base their contention upon a 1913 book valuation of the Rosehill company property of approximately $11,000,000, which valuation was one made by the auditor of Rosehill and accepted by the United States Government for income tax purposes. However, a subsequent redetermination of that valuation made by the United States Government reduced it to $3,000,000 as of March 1, 1913. The evidence as to the various sales of Rosehill stock during this period indicates sales at various prices, none exceeding $325 a share for certain shares purchased where the payment was to be extended over a period of years. The master found, and his finding was confirmed by the trial court, that the reasonable fair market value from 1912 to 1916 of Rosehill shares was not in excess of $300 each. This finding is supported by the evidence. That is the amount for which the shares were sold under the order of Judge Windes on November 19, 1915. Petitioners contend that this order was entered by the court without *284 being fully informed of all the facts. The order recited that the parties in interest had been notified of the petition. No appeal was taken from the order.
[11] This was not the case of the foreclosure of a mortgage on a cottage. The entire proceedings surrounding the closing of the La Salle Street Trust and Savings Bank and the various matters of litigation growing out of and concerning it, were matters of high public interest and were fully covered by the press. Of this the court takes judicial notice. It is impossible for us to believe that matters of such great public notoriety were not within the purview of the parties and of the court which entered the orders.
[12] On May 22, 1914 a stockholders' suit by the minority Rosehill stockholders was filed by Dempster against Munday and his associates, in which an appearance was entered for William Lorimer and William Lorimer, Jr., by Francis M. Lowes, attorney, who is one of the attorneys representing the petitioners before this court. The filing of this suit and the allegations therein were matters of public record. There was in existence at this time a stockholders' committee, representing more than 90 per cent of the creditors of the State Bank, properly selected and in close contact with all of the acts of the receiver. The members of this stockholders' committee were well-known financiers and leaders of the Chicago bar. We agree with the statements of the trial court in his opinion: "What can be said, and what is material to the issues now presented, is that there is not a scintilla of evidence to substantiate the charge that Niblack, in his conduct of the State Bank receivership, perpetrated a fraud on the bank, its shareholders or creditors...."
One of the contentions of the petitioners is that Munday and his associates, while directors and officers of the National Bank, made, as the petition alleges, "pretended loans" from the bank, and that because of such improper use of the funds of the National Bank, *285 the National Bank would have been entitled to have a constructive trust imposed upon all the shares of Rosehill delivered under the Lansingh contract and upon the Lansingh contract, to which trust the receiver of the State Bank succeeded. To substantiate such contention the petitioners rely on the evidence of Hiram B. Kadish and upon a report made by the said Kadish dated October 1, 1915 to one Hiram T. Gilbert, then attorney for Niblack as receiver for the State Bank. The testimony of Kadish before the master on the hearing on this petition was based upon his report made to Gilbert, which report was prepared by him from memoranda and work sheets made by him from an examination of the books of the National Bank, the State Bank, the Cemetery Securities Company, certain country banks in which Munday was interested, the Ashland 12th Street Bank, Calumet State Bank, the Broadway State Bank and other sources. When Kadish was offered as a witness by the petitioners, all of his testimony was objected to by the respondent on the grounds that it was hearsay, that the books were the best evidence, that the books were not produced and there was no showing that they were not available or could not be produced, that there was no showing that the books were books of original entry which would have been admissible if produced, and that the testimony was nothing but a reading of the said report which in itself would not have been admissible, and that it was sought to bind respondent because the witness had been employed by Niblack, but that Niblack's agent in 1915 could not bind respondent in 1946. The master admitted the testimony subject to the petitioners later connecting it up by proving that Niblack and respondent were one and the same person in 1915.
The report which Niblack made to Gilbert in 1915 was also offered in evidence by the petitioners, which was objected to by the respondent on the ground that it was not the best evidence and was not binding on the *286 respondent. The exhibit was admitted, and subsequently the respondent introduced the same exhibit used by it in cross-examining Kadish for the limited purpose of showing the basis of such cross-examination.
[13-15] The master properly considered that the evidence of Kadish and the report were hearsay and not competent unless it was shown that the respondent in 1915 was the receiver in fact, in which case Kadish, who had been hired by Niblack, would have been the agent of the respondent and the report might have been competent as an admission. In our opinion such connection was not shown. Neither the testimony nor the report was the best evidence and properly should not have been considered by the master. Written statements prepared for use at a trial may only be admitted where they are merely in the nature of summaries of voluminous records which are in evidence. People v. Sawhill, 299 Ill. 393; Inter-State Finance Corp. v. Commercial Jewelry Co., 280 Ill. 116; Bood v. Barsaloux, 261 Ill. App. 321. The fact that the report was admitted on the offer of respondent for a limited purpose did not change the situation. Morris v. Central West Casualty Co., 351 Ill. 40. Without the evidence of Kadish and without the report there would be little evidence concerning the alleged wrongful misappropriation of funds of the bank by Munday and his associates; and even with the evidence of Kadish and his report in the record, the conclusion can be drawn, supported by evidence, that the money used in the initial purchase under the Lansingh contract was raised by loans made from the National Bank in part and in part from money advanced by Munday. There is nothing in the record clearly indicating where Munday obtained the $100,000 initial cash payment. In his findings approved by the trial court the master found that the monies so used were obtained by way of proper, legitimate and authorized *287 loans. This finding is not against the manifest weight of the evidence.
[16] Counsel rely upon certain testimony on the part of Kadish that at the time when the bank was closed in 1914 there was in its possession over $250,000 of Munday's kited checks. There is nothing to connect the condition at the closing of the bank with the purchase of the Rosehill shares except by piling inference upon inference to the point of absurdity. At that time state or national banks under the law could make loans to their officers. Ill. Stat. Ann., Jones & Addington, 1913, vol. 1, ch. 16a, sec. 10, par. 682; Federal Deposit Ins. Corp. v. Vest, 122 F.2d 765. The trial court in its opinion says:
"The record shows that Munday and his associates, or the Cemetery Securities Company, obtained loans from the National Bank, but there was no evidence in the record that they, or the Cemetery Securities Company, ever obtained any moneys or funds from either the National of State Banks which were not advanced by way of proper and lawful loans and which were duly authorized by the respective Boards of Directors of said Banks."
In this we concur.
[17-19] The respondent contends that the orders and decrees heretofore entered in this case are binding upon the petitioners and are not subject to collateral attack. The petitioners have alleged in their reply brief that they are not collaterally attacking the orders. The ground for such theory is not stated, and we are unable to accept it. In Barnard v. Michael, 392 Ill. 130, the court says:
"A judgment, order or decree entered by a court which lacks jurisdiction of the parties or of the subject matter, or which lacks the inherent power to make or enter the particular order involved, is void, and may be attacked at any time or in any court, either directly or *288 collaterally. An application to vacate a judgment or decree, made to the court that rendered it within thirty days after its entry, is a direct attack upon the judgment or decree, but if made after the expiration of thirty days it is a collateral attack."
In Baker v. Brown, 372 Ill. 336, the court says:
"The general rule is, a judgment rendered by a court having jurisdiction of the parties and the subject matter, unless reversed or annulled in some proper proceeding, is not open to contradiction or impeachment in any collateral action or proceeding, except for fraud in its procurement, and even if the judgment is voidable and is so illegal or defective that it would be set aside or annulled on a proper direct application, it is not subject to collateral impeachment so long as it stands unreversed and in force. (People v. Sterling, 357 Ill. 354; East St. Louis Lumber Co. v. Schnipper, 310 Ill. 150; Weberpals v. Jenny, 300 Ill. 145; Donner v. Highway Comrs., 378 Ill. 189; Miller v. Rowan, 251 Ill. 345; Figge v. Rowlen, 185 Ill. 234.) This rule is so well settled it is not open to question."
Also, in People v. Village of Bradley, 367 Ill. 301, the court says:
"Judgments and decrees of courts having jurisdiction of the parties and the subject matter are conclusive between the litigants until reversed in a direct proceeding. They cannot be challenged for errors, however obvious, in a collateral proceeding. Wolff v. Schwill & Co., 351 Ill. 28; Murphy v. Murphy, 343 Ill. 234; People v. Thompson, 316 Ill. 11; People v. Lee, 311 Ill. 552."
[20-22] Apparently the crucial orders in the case are the orders entered on January 30, 1915 and November 19, 1915. The order of January 30, 1915 ordered Niblack not to use any receivership funds to make payments on the Lansingh contract. The order of November 19, 1915 ordered that Niblack be authorized to *289 make the sale of the 352 1/2 shares of Rosehill stock held by the State Bank as collateral on the note of the Cemetery Securities Company, for $300 per share to one Ashcraft. The order of November 19, 1915 was, in our opinion, a proper order entered by the court and was a final and appealable order. In Carter v. Carter, 283 Ill. 324, the court says:
"All transactions are presumed to be fair and honest until the contrary is proved. Fraud will not be presumed but must be proved as a fact by such clear and convincing evidence as leaves the mind well satisfied that the allegations of fraud are true. (McKennan v. Mickelberry, 242 Ill. 117.)"
The burden here was on the petitioners to prove fraud in the procurement of the order. As we have stated, we find nothing in the record to indicate such fraud on the part of Niblack.
The same reasoning would apply to the order of March 27, 1915, by which Niblack was directed to accept a compromise with Munday's trustee in bankruptcy of his (Niblack's) claims as receiver against Munday. All of these orders were appealable. No appeal was taken. In none of them is there anything on the face of the record to show lack of jurisdiction over the parties and subject matter, and it affirmatively appears from the record that all parties had notice and an opportunity to be heard.
[23, 24] On December 15, 1920, after the death of Niblack, the court approved his final account as receiver and discharged him and his estate as receiver. This report was examined and approved by the committee representing the creditors. No objections were filed by the petitioners or any creditor to this report. On November 21, 1924 the respondent filed its final report as receiver of the State Bank. The court entered an order directing all persons to file objections to said report on or before December 2, 1924 and directing *290 that notice be given of such order by publication, that personal notice be given to the committee of creditors and notice be given by mail to twenty-five or more of the principal creditors of the State Bank or their attorneys. No objections were filed to the report, and on December 17, 1924 the court entered its order approving the final report, which order recited that the foregoing notices had been given. This order recited that the report and account of the receiver of receipts and disbursements was correct and ordered the receiver to distribute the balance on hand among the creditors and that upon such distribution being made that the respondent be discharged from all further liabilities to the stockholders; and it further provided that the respondent prosecute such proceedings as may now be pending for the purpose of securing payment of the O'Gara note. No appeal was taken from either of these orders. The orders were final and appealable. In People v. Illinois State Bank of Crete, 312 Ill. 613, the court says:
"While this court has not decided the precise question presented, it has repeatedly held that a final decree is not necessarily the last order in a case, and that any order which finally fixes the rights of the parties is final and appealable. (Sebree v. Sebree, 293 Ill. 228; DeGrasse v. Gossard Co., 236 Ill. 73; Allison v. Drake, 145 Ill. 500.)"
See also Equitable Trust Co. v. Wilson, 200 Ill. 23; Groves v. Farmers State Bank of Woodlawn, 368 Ill. 35.
[25] In both reports which were filed, no mention was made of the stock of the Rosehill Cemetery Company or of the Lansingh contract. The Petitioners contend that these reports were not final reports and that upon the filing of a final report the door is open to investigate all former reports filed by the receiver, and in support of such contention cite Stelle v. Ruprecht, *291 147 Ill. App. 646. A reading of the case does not bear out the contention of the petitioners. In that case the court says:
"The administration of a receivership or other trust is one and a continuous matter. An order entered therein by the chancellor may or may not be final. Whether or not it be so depends both upon the intent or design in the entry thereof and upon what was actually done or considered at its rendition.... Final orders are necessary, of course, upon distributions and in instances where the rights of any of the parties litigant or intervenors are finally passed upon; but they are not necessary upon the entry of orders allowing payments, for services and incidental expenditures, to receivers."
Standish v. Musgrove, 223 Ill. 500, also cited by petitioners, was a case where the expenditures of the receiver were investigated on the final report. In the case before us there was no question raised as to the propriety of the receiver's expenditures. The only question raised is as to whether or not the actions of the previous receiver in 1914 and 1915 were proper. In the order entered by the court on December 17, 1924 the respondent was discharged subject to the distribution of the assets in its possession. A case more closely in point is Boyd v. Magill, 100 Ill. App. 316, in which the court says: "When a receiver is discharged all right upon the part of the court to proceed against him summarily ceases...."
The respondent in its answer to the petition sets up the statute of limitations and laches. June 19, 1914 an order was entered appointing Niblack receiver of the State Bank, and enjoining the bank, William Lorimer, its president, C.B. Munday and Charles G. Fox, its vice-presidents, Thomas McDonald, its cashier, and all of its other officers, directors, stockholders, employees, servants, agents and all other persons from selling, *292 pledging, hypothecating, encumbering, transferring or otherwise disposing of, or interfering with, any of the property of said bank until further order of the court. An order was entered on January 30, 1915 which forbade the receiver, Niblack, to use any receivership funds to make payments on the Lansingh contract. An order was entered on March 27, 1915 on the petition of Niblack directing him to accept an offered compromise made by Munday's trustee in bankruptcy of the receiver's claims. On November 19, 1915 an order was entered authorizing Niblack to sell to Ashcraft for $300 per share the 352 1/2 shares of Rosehill stock held by the State Bank as collateral for the note of Cemetery Securities Company. On May 22, 1914 a minority stockholders' suit was filed by Dempster against Munday and his associates, alleging that they had looted the Perpetual Care Fund of the Rosehill cemetery, and on November 25, 1914 the Chicago Title and Trust Company was appointed receiver of Rosehill cemetery. On November 30, 1915 a decree was entered reciting that the Dempsters were owners of all the stock of the Rosehill Cemetery Company. On December 28, 1914 Niblack as receiver of the State Bank filed suit against Munday and his associates in which he claimed to be the beneficial owner of the Lansingh contract, subject to whatever priority rights there might be under the contract and which might be established in favor of the Rosehill cemetery. That suit was dismissed by stipulation on February 25, 1918. On December 15, 1920, after the death of Niblack, his final report was approved and his estate and the sureties on his bond were discharged. On November 21, 1924 the respondent filed its final report, to which no objections were made, and on December 17, 1924 the court approved the report subject to the receiver making distribution.
[26] All of the orders were entered after notice had been given to the creditors of the bank. No objections *293 were filed to any of the orders. We find it impossible to believe that at the time of the entry of these orders, or shortly thereafter, that the present petitioners did not have full knowledge of all the facts raised in the instant petition. On March 2, 1925 the Chicago Title and Trust Company and Rosehill cemetery brought a bill for foreclosure in Montgomery county against the Litchfield Mill and Elevator Company and Munday. In that suit, on June 13, 1925, Munday filed a cross-bill making substantially the same allegations as were made in the instant petition, and Lorimer filed an intervening petition in the same suit, which was subsequently dismissed. On January 12, 1932 the instant petition was filed by leave of court. From 1925 to 1932 the record definitely shows that the petitioners had knowledge of everything set forth in their petition. During the time from the entry of the order of November 19, 1915 the petitioners had the right to ask the state auditor to remove Niblack as receiver of the State Bank. They had the right to request the receiver to act, and if he declined, to petition the court to compel him to proceed. Trimble v. Woodhead, 102 U.S. 647. They had the right to ask the court for leave to file an intervening petition. No such action was taken. No objections were filed to the reports of Niblack or the Chicago Title and Trust Company, nor were objections of record made to the entry of any of the orders. All of the orders were final and appealable. Nothing was done by the petitioners until 1932. They slept on their rights for seventeen years.
The petitioners contend that they were prohibited from taking any action because of the injunction entered on June 19, 1914. They were not so restrained. When they requested leave to file their petition in 1932 the court gave them such leave in a broad order. The excuse which the petitioners urge for their failure to act is not tenable. The master found that the petitioners *294 were guilty of laches and his report was confirmed by the court. In Dempster v. Rosehill Cemetery Co., 206 Ill. 261, the court says:
"Upon the question of laches, and after reviewing the conduct of Sherman with reference to this entire transaction, the master says: `... One important principle involved in the term laches is, that after a long lapse of years, during which testimony is impaired or destroyed, witnesses remove or die, their recollection is dimmed or lost, and papers, letters, documents, books, records, etc., are lost or destroyed, or if not lost or destroyed are in the hands of persons not familiar with their contents, liable to misinterpret them, unable to supply their defects or correct the same or explain them from the memory of living witnesses, the defendant is at the complete mercy of any claimants who may wish to take advantage of the situation. Time impairs and destroys evidence of the true facts, and makes it practically impossible to meet positive testimony of the complainants, whether the same be true or untrue. A court of equity, therefore, finding itself unable to render substantial justice between the parties, asserts the principle of laches on the ground of public policy and for the repose of property rights.' This declaration of the master is in entire harmony with our view of what is shown by this record and the law applicable to it."
This statement is particularly applicable to this case. In Spies v. DeMayo, 396 Ill. 255, the court says:
"As so pertinently observed in McDearmon v. Burnham, 158 Ill. 55, referring to delay covering a period of fourteen years, `When a court of equity is asked to lend its aid in the enforcement of a demand that has become stale, there must be some cogent and weighty reasons presented why it has been permitted to become so. Good faith, conscience and reasonable diligence of the party seeking its relief are the elements that call *295 a court of equity into activity. In the absence of these elements the court remains passive, and declines to extend its relief or aid. It has always been the policy to discountenance laches and neglect.' Death has silenced many of the active participants in the transactions leading to the execution of the deed...."
See also Follansbe v. Kilbreth et al., 17 Ill. 522, and Thomas v. VanMeter, 164 Ill. 304. The petitioners here were guilty of laches.
The petitioners urge that the question of their laches was passed on by this court in their favor in Lorimer v. Rosehill Cemetery Co., 325 Ill. App. 258. A reading of the case does not bear out that contention.
The petitioners urge that they could not be held guilty of laches because they promptly filed objections to the reports of 1932, 1940 and 1943. These objections raise the same issues as those raised in the intervening petition of the petitioners. To substantiate their validity a judicial determination would be required. This would be a determination of the same issues on which the petitioners lay dormant for seventeen years. They cannot be helped by their belated diligence.
[27] The respondent made a motion in this court to strike from the record pages 5,237 to 5,248 and from the abstract filed by petitioners pages 244 and 245 and the first eleven lines on page 246, on the grounds that the matters contained therein were not offered or received in evidence. It so appears from the record. The motion was taken with the case, and we order the said portions of the record and abstract stricken.
From the record before us it appears that in the suit filed on March 2, 1925 by the Chicago Title and Trust Company and Rosehill Cemetery Company against the Litchfield Mill and Elevator Company and Munday that by the cross-bill of Munday substantially the same issues were raised and there was substantially the same prayer for relief. That case was fully litigated, *296 and in fact a great portion of the record in this case consists of depositions taken in that case and admitted here by stipulation of the parties. While the decision in that case is not binding, we note that the chancellor reached the same conclusion as the trial judge in the case now before us. Munday's cross-bill was dismissed for want of equity.
The original bill in the instant case was filed on June 18, 1914. Litigation relating to the receivership and the closing of the bank has been repeatedly passed on by this court and the Supreme Court of this State, as appears from the following cases: Golden v. Cervenka, 278 Ill. 409; Golden v. Cervenka, 212 Ill. App. 665; Golden v. Cervenka, 216 Ill. App. 397; Chicago Title & Trust Co. v. Central Trust Co., 224 Ill. App. 474; Chicago Title & Trust Co. v. Central Trust Co., 312 Ill. 396; Lorimer v. Rosehill Cemetery Co., 325 Ill. App. 258. In Chicago Title & Trust Co. v. Central Trust Co., 312 Ill. 396, one of the suits involving such related matters, the court says:
"This case has now been twice reviewed by this court. The cause has been twice tried before the circuit court at enormous cost to the parties.... This shows that this litigation ought to end, if it can equitably be ended and without violating any positive rules of law, by our decision in this case."
If that statement was true in 1924, today it is uncontrovertable. There is a time when all litigation must come to a conclusion. The decree which is now before us for review terminates the suit once and for all. We find no error in the record, and the decree of the circuit court is affirmed.
Decree affirmed.
ROBSON and SCHWARTZ, JJ., concur.